**UNITED STATES of America, Plaintiff,**

v.

**Michael STEVENS, Dan Cotsirilos, John P. Heck, and David Shlagman, Defendants.**

**No. 82 CR 122.**

United States District Court, N. D. Illinois, E. D.

July 19, 1982.

Robert Breisblatt, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Kent R. Brody, Herbert Abrams, Edward M. Genson, Robert J. Cooley, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

The defendants Michael Stevens, Dan Cotsirilos, John P. Heck, and David Shlagman were named in a four-count indictment returned by the February 1982 Grand Jury. Each was charged with receiving two stolen motion pictures, "Raiders Of The Lost Ark" and "On The Right Track", in violation of 18 U.S.C. §§ 2315 and 2, and infringing the copyrights of these two films in violation of 17 U.S.C. § 506(a) and 18 U.S.C. § 2.

Defendants Stevens, Cotsirilos, and Shlagman each have filed a number of pretrial motions. Defendants Heck and Stevens have filed general motions to adopt the pretrial motions and briefs filed by their codefendants.

The Court has previously denied the motions to sever. In this Memorandum Opinion and Order, the Court rules on the following motions: (1) motions to suppress evidence seized pursuant to a search warrant; (2) motions to suppress statements; (3) Stevens' motion to dismiss the indictment; (4) Cotsirilos' motion to dismiss the indictment (adopted by his codefendants); (5) motions for a bill of particulars; and (6) motions for production of exculpatory material (including Stevens' motion to produce

evidence concerning inducements, promises and compensation to prospective government witnesses).

### I. *Motions to Suppress Evidence*

The defendants have filed motions to suppress evidence seized pursuant to a search warrant issued by Magistrate Sussman on June 11, 1981, and executed on the same date. Pursuant to this warrant, prints of the movies "Raiders Of The Lost Ark" and "On The Right Track", as well as an assortment of video cassette recorders, tapes, and film materials, were seized.

Shlagman, Cotsirilos, and Heck affirmatively state that they have "standing" to challenge the legality of the search warrant, while the government contests their "standing" to raise this defense. For the reasons stated below, the Court finds that Cotsirilos, Shlagman, and Heck lack the capacity to challenge the legality of the search warrant. Their motions to suppress are denied.

Stevens also claims "standing" to challenge the legality of the search warrant, which right the government does not contest. The Court finds that Stevens has capacity to challenge the warrant, but denies his motion to suppress as well.

### A. *Legal Capacity of Cotsirilos, Shlagman, and Heck to Challenge the Search Warrant*

■ These three defendants state that the evidence seized as a result of the search at 531 Wrightwood, Elmhurst, Illinois, included "one or two of the defendants' video recorders," that they were playing cards with friends in a "once a week game" at the location searched (which they state was owned by their codefendant Stevens), and that pursuant to *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), they have "standing" to challenge the sufficiency of the search warrant.

In *Rakas v. Illinois, supra,* the Court rejected the analysis of "standing" as the measure of the legal capacity to assert, by way of a motion to suppress evidence, the protection of the Fourth Amendment. The Court stated that in order to challenge the

legality of a search warrant, a defendant must allege that his "legitimate expectation of privacy" was violated by the search. *See United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

These defendants, who played cards once a week at Stevens' place of business, cannot be said to have had a legitimate expectation of privacy in the premises searched. They have alleged no right to exclude others from this location, no right to use the premises in Stevens' absence, the possession of no key, nor the presence of clothes, books, food, or anything else even arguably creating a legitimate expectation of privacy in the premises searched. *Cf. United States v. Swart*, 679 F.2d 698 (7th Cir. 1982) (legitimate expectation of privacy in defendant's place of business, allowing defendant to challenge warrantless search); *United States v. Posey*, 663 F.2d 37 (7th Cir. 1981), *cert. denied* —— U.S. ——, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982) (defendant driving his wife's car had legitimate expectation of privacy in the car to contest warrantless search); and *United States v. Lupo*, 652 F.2d 723 (7th Cir. 1981) (no legitimate expectation of privacy in trunk of codefendant's car). The fact that one or two video recorders owned by some of these defendants were present at the location searched does not by itself give them legal capacity to challenge the search. The "automatic standing" rule of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), seemingly relied on here by these defendants, was rejected and *Jones* overruled by *United States v. Salvucci, supra.* Thus the motions of Cotsirilos, Shlagman, and Heck to suppress the evidence seized, and their derivative motions to suppress statements made after the search, under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), are denied.

### B. *Stevens' Challenge of the Search Warrant*

The government has not challenged, on grounds of "standing" or the lack of a "le-

gitimate expectation of privacy," Stevens' motion to suppress evidence seized pursuant to the search warrant. Thus this Court must reach the question of the sufficiency of the search warrant pursuant to which allegedly incriminating evidence was seized.

At the outset, the Court must state that the question of the existence of probable cause presented by the affidavit in support of the application for the search warrant is a close question. However, after careful consideration of the affidavit in light of the applicable precedent, the Court finds that probable cause did exist, and therefore denies Stevens' motion to suppress.

### 1. *The Affidavit*

On June 11, 1981, at 3:03 a. m., Special Agent of the FBI, Kenneth R. Misner swore to an 11-paragraph affidavit presented to Magistrate Sussman. The first four paragraphs of the affidavit sketch out in broad form Misner's background with the FBI, including his work investigating alleged criminal violations of the copyright act, and a lengthy general description of the practice of unauthorized duplications and sales of copyrighted motion pictures.

The parts of the affidavit relevant to the present inquiry state:

5. On June 9, 1981, at approximately 2:30 p. m., I received a telephone call from Ewing Layhew of the Film Security Office of the Motion Picture Association of America in Hollywood, California. He advised me that he is responsible for the investigation of illegal or bootleg reproduction of copyrighted films, and in that capacity he is familiar with those films which are copyrighted. The Film Security Office has previously provided me with accurate information concerning copyrighted material and films. During this conversation Layhew advised me that the film "Raiders Of The Lost Ark" is owned by Paramount Pictures Corporation and was published with requisite copyright notice and registration is pending.

6. On June 10, 1981, Layhew advised me that on June 8, an anonymous telephone call was received by Joseph Mascaret, Vice President, Film and Videotape Security, Paramount Pictures, New York, New York, to the effect that the anonymous caller advised that Dennis Johnson, Assistant Manager at the Fair Plain Cinema 5 Theatre located in Benton Harbor, Michigan, planned to take a .35 millimeter print of "Raiders Of The Lost Ark" to be duplicated during the night of June 10 to June 11, 1981, at a warehouse near the Indiana-Illinois border. The anonymous caller additionally advised that Johnson had previously transported films to this warehouse for duplication.

7. Layhew stated that a contract exists between Paramount Pictures and the Fair Plain Cinema 5 Theatre which states that the film "Raiders Of The Lost Ark" is to be used in the Fair Plain Cinema 5 Theatre from June 12, 1981 to July 10, 1981, and that the theatre has no right to duplicate the film or to have screenings in any other locations.

8. Robert Barenie, Special Agent of the Federal Bureau of Investigation assigned to the Benton Harbor, Michigan office of the FBI advised me that a Dennis Johnson was in fact the Assistant Manager at the Fair Plain Cinema 5 Theatre located at Fair Plain Plaza corner of M–139 and Napier Avenue, Benton Harbor, Michigan. Special Agent Barenie also advised that he is aware that the film "Raiders Of The Lost Ark" is due to begin showing at the theatre on June 12, 1981, and that a print of that film is on hand at that theatre currently.

9. Special Agent Barenie advised me that a physical surveillance was initiated at the Fair Plain Cinema 5 by Federal Bureau of Investigation Special Agents beginning at 11:00 p. m. Detroit time June 9, 1981. Johnson was visually observed entering the Fair Plain Cinema 5 Theatre at approximately 4:00 p. m. on June 10, 1981, and subsequently left the theatre at approxi-

mately 11:45 p. m. Johnson made two separate trips from the theatre to his automobile both of which times objects were taken from the theatre and placed in an automobile described as a 1978 Chevrolet Camaro, Michigan license number PZH 023. Johnson was under continual surveillance by James Hiller and Robert Kessler, Special Agents of the Federal Bureau of Investigation during his traveling from the Fair Plain Cinema 5 Theatre to 531 W. Wrightwood, Elmhurst, Illinois.

10. I was telephonically advised by Special Agent Wally Erickson of the Detroit FBI that Fred Behrends of the Film Security Office entered the Fair Plain Cinema 5 Theatre at approximately 12:15 a. m. on June 11, 1981 and determined that the movie "Raiders Of The Lost Ark" was missing from the theatre. The theatre manager Floyd Murphy advised that Johnson had no permission to take any film prints from the theatre, including "Raiders Of The Lost Ark". Behrends advised Erickson that the Film print number for the copy of "Raiders Of The Lost Ark" taken from the theatre is number 397.

11. I was telephonically contacted by Special Agent Robert Barenie who provided the following description of the building entered by Johnson:

A one-story brick industrial type building, beige in color with 3 windows and one door on the east side and a loading dock on the west side. The address of the north side of the building is 531 W. Wrightwood, Elmhurst, Illinois. The address is in gold colored letters and located on a stationary window above the entry door, which is constructed of glass and metal frame. A sign in front of the 531 W. Wrightwood address indicates the business name Auvicom, Inc.

Since the affidavit rests in large part on the tip of an anonymous informant, the initial determination as to the existence of probable cause must be analyzed according to the standards set out in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The often-cited and quoted *Aguilar* test states: "Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, . . . was 'credible' or his information 'reliable.' " 378 U.S. at 114, 84 S.Ct. at 1514. *Spinelli* has termed this the *Aguilar* "two-pronged test."

### 2. Compounded Hearsay

■ The defendants first challenge the warrant on the grounds that the affidavit contains numerous hearsay statements from various sources which fail the *Aguilar* tests, though they cite no law to support such a position, and the government altogether fails to address it.[1]

It has repeatedly been held that when the information presented in the affidavit is hearsay compounded upon hearsay, the length of the chain of the hearsay is not necessarily fatal: "Multiple hearsay is of course acceptable so long as the reliability and source of knowledge of each declarant is sufficiently shown." *United States v. Finn*, 502 F.2d 938, 941 (7th Cir. 1974) (citing *United States v. Carmichael*, 489 F.2d 983, 986 (7th Cir. 1973) (*en banc*), and *United States v. Wilson*, 479 F.2d 936, 941 (7th Cir. 1973) (*en banc*)).

The affidavit of FBI Agent Misner indicates that four other FBI agents (Barenie,

---

1. It must be pointed out that with the exception of the seminal cases in this area—*Aguilar, Spinelli*, and *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (apparently raised by Judge Marshall at a status hearing)— neither the government nor the defendants discuss or even cite any of the numerous cases addressing the various complex issues raised by the attack on the warrant.

Erickson, Hiller, and Kessler) reported to Misner. It is well established that when police officers or governmental agents report information to other officers or agents who set out the information in an affidavit for a search warrant, the *Aguilar* requirements for establishing veracity of the informant and the basis of the informant's conclusions have been met. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. DeCesaro*, 502 F.2d 604, 607 at fn. 6 (7th Cir. 1974). Thus, the FBI agents' links in the hearsay chain are not defective.

Three people connected with the film industry also provided information set forth in Agent Misner's affidavit. Ewing Layhew, of the Film Security Office of the Motion Picture Association of America in Hollywood, gave information to Agent Misner in telephone conversations on June 9, 1981, and June 10, 1981. In the conversation on June 10, 1981, Layhew told Misner of information received from an anonymous caller by Joseph Mascaret, Vice-President, Film and Video Tape Security, Paramount Pictures, in New York. In addition, Fred Behrends of the Film Security Office spoke to Floyd Murphy, the manager of the theatre in Benton Harbor from which the film "Raiders Of The Lost Ark" was allegedly taken, and Behrends communicated this information to FBI Agent Erickson who passed it along to the affiant, Agent Misner. Thus there is a question as to the adequacy under *Aguilar* of the statements made to the FBI agents by the three employees of the film industry.

The hearsay statements of Layhew, Mascaret, and Behrends may be found to meet the *Aguilar* tests in either of two ways. First, it should be noted that each worked for the security arm of the film industry. Their duties—investigating the theft or unauthorized duplication of copyrighted films—may be said to be nearly analogous to the roles of the FBI agents themselves, and therefore pursuant to *United States v.*

*DeCesaro, supra,* they have met the *Aguilar* tests. Second, hearsay given to an affiant by persons in the ordinary course of fulfilling their business duties has been found acceptable under the *Aguilar* tests. *See United States v. Rowell*, 612 F.2d 1176 (7th Cir. 1980) (unnamed employee of American Express communicating information to named police informant found not inherently reliable; "basis" of the American Express employee's information was the normal course of business at American Express); *United States v. Wilson*, 479 F.2d 936 (7th Cir. 1973) (*en banc*).

Finally, the information communicated by theatre manager Floyd Murphy also is adequate under *Aguilar*. Murphy's information was given in the normal course of his business. *See United States v. Rowell, supra; United States v. Wilson, supra.* In addition, the report of a victim of a crime, such as Murphy here, satisfies the *Aguilar* standards. *United States v. Burke*, 517 F.2d 377, 380 (2nd Cir. 1975).

### 3. *The Anonymous Informant's Tip Under Aguilar*

The anonymous caller gave the following information to Mascaret on June 8, 1981:

> Dennis Johnson, Assistant Manager at the Fair Plain Cinema 5 Theatre located in Benton Harbor, Michigan, planned to take a .35 millimeter print of "Raiders Of The Lost Ark" to be duplicated during the night of June 10 to June 11, at a warehouse near the Indiana-Illinois border. The anonymous caller additionally advised that Johnson had previously transported films to this warehouse for duplication.

This tip fails to meet the *Aguilar* standards. The magistrate could not have determined whether the anonymous informant was credible or reliable, or whether the informant could have testified to facts within his [2] personal knowledge to show the basis for his bald conclusion that criminal activity was afoot.

---

**2.** Though the affidavit does not identify the sex of the informant, the Court takes the liberty of referring to the informant as a male.

Many courts have held, however, that the "veracity" and "basis of knowledge" prongs of the *Aguilar* tests may be satisfied by the corroboration of the information, and inferences fairly drawn from an examination of the details, provided by the informant.[3]

### a. The Veracity Prong

It is clear that the magistrate could not have adjudged the anonymous informer to have been credible based upon the information he supplied. His contact, Mascaret of the Film and Videotape Security Office of Paramount Pictures, did not attest to his veracity or reliability. There is no statement that in the past he provided information leading up to arrests and convictions, that he was a witness to or a victim of the crime, *United States v. Burke*, 517 F.2d 377 (2nd Cir. 1975), or that the information given was an admission against penal interest. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

Where, however, there has been corroboration of many of the details given by the informant, demonstrating his truthfulness as to at least some of the information conveyed, it has been held that such corroboration shows that the informant is reliable within the meaning of *Aguilar*. *See United States v. Marcello*, 570 F.2d 324 (10th Cir. 1978); *United States v. Unger*, 469 F.2d 1283 (7th Cir. 1972), *cert. denied* 411 U.S. 920, 93 S.Ct. 1546, 36 L.Ed.2d 313 (1973); and *cf. Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Although *Draper* was a case where the informer had a track record of reliability and provided numerous details describing the physical appearance of the defendant,

*Draper* may also be read to stand for the proposition that the corroboration of many details provided by the informant may itself satisfy the veracity prong of the *Aguilar* test. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. Unger, supra; Stanley v. State, supra* 313 A.2d at 854 n. 3.

The FBI agents, through their own investigation, were able to corroborate the following information provided by the informant:

(1) Dennis Johnson was the assistant manager of the Fair Plain Cinema 5 Theatre;

(2) The theatre was located in Benton Harbor, Michigan;

(3) The film "Raiders Of the Lost Ark" was present in the theatre sometime prior to 12:15 a. m. on June 11, 1981;

(4) During the night of June 10–11, 1981, Johnson drove from Benton Harbor, Michigan, to Illinois.[4]

While it is true that the details corroborated by the agents were "innocent" details,[5] the corroboration is sufficient to satisfy the veracity prong of *Aguilar*. *See Draper v. United States, supra.*

### b. Basis of Knowledge Prong

Under *Aguilar* and *Spinelli*, the magistrate must be informed of the basis for the informant's conclusion that criminal activity is afoot. The danger in not examining the affidavit to determine whether the informant had personal knowledge of the information relayed was explained by Justice Harlan:

---

3. Much of the framework of the legal analysis which follows is based on the perceptive opinion of Judge Moylan in *Stanley v. State*, 19 Md.App. 507, 313 A.2d 847 (1974). *See also United States v. Button*, 653 F.2d 319 (8th Cir. 1981).

4. Defendants claim that the informant's statement that the film "Raiders" was to be duplicated in a warehouse near the Indiana-Illinois border turned out to be incorrect, in that the warehouse was in Elmhurst, Illinois, which the defendants claim is not "near" the Indiana-Illinois border. The Court finds this alleged discrepancy between the facts and the description

of the location given by the informant to be insignificant.

5. That Johnson was the assistant manager of the theatre, that "Raiders" was scheduled to play at this theatre beginning on a date certain, and that the theatre was located in Benton Harbor, Michigan, were all details of a public nature that anyone could have determined by one telephone call. The fact that Johnson drove from Michigan to Illinois, as predicted, is more probative, though it too does not bespeak criminal activity. *See* discussion of *Spinelli v. United States, supra*, below.

In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.... This meager report could easily have been obtained from an offhand remark heard at a neighborhood bar.

*Spinelli v. United States*, 393 U.S. at 409–10, 89 S.Ct. at 586. *See also United States v. Mancillas*, 580 F.2d 1301, 1305 (7th Cir.) *cert. denied* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978); *United States v. Spach*, 518 F.2d 866, 870 (7th Cir. 1975). The greater the detail provided by the informant, the more likely it is that the informant saw and/or participated in the criminal activity described. *Cf. United States v. Bush*, 647 F.2d 357 (3rd Cir. 1981) (where informant made a quick series of telephone calls during contact with agent, it was clear that the informant was being given information by another, but undisclosed, informant whose reliability could not be determined under *Aguilar*).

The details provided by the anonymous informant to Mascaret give no indication, and allow no reasonable inference to be drawn, that the informant had personal knowledge of that which he communicated. The statement that Johnson would take the film "Raiders" to Illinois, there to be duplicated, is the kind of bald conclusion of criminal activity disapproved in *Spinelli.* The tip states no underlying circumstances from which the magistrate could determine that the informant's conclusion that criminal activity was afoot was reasonable or probably correct. It is at least as likely that he received the information from still another undisclosed informant who may have had personal knowledge, or from "an offhand remark heard at a neighborhood bar." *Spinelli, supra* 393 U.S. at 417, 89 S.Ct. at 589–90. The *Aguilar* requirement for the showing of the "basis of the circumstances" on which the informant based his conclusion of criminal activity is not satisfied here.

### 4. Corroboration Boosting the Inadequate Tip Over the Probable Cause Threshold

██ Even where the information provided by the *informant* is inadequate under *Aguilar*, the affidavit looked at as a whole may nevertheless provide probable cause for the issuance of the search warrant. *See, e.g., United States v. Spach*, 518 F.2d 866, 869 (7th Cir. 1975). One court has spoken of "the role of corroboration in boosting an inadequate tip over the probable cause threshold...", and has stated that "[t]he cases give us numerous instances of an inadequate tip being lifted over the threshold by corroboration of facts which of themselves are direct or circumstantial evidence that criminal activity is afoot." *United States v. Smith*, 598 F.2d 936, 938 (5th Cir. 1979) (where a divided court held that the corroboration of only "innocent details" was not enough to boost the tip, inadequate in itself under *Aguilar*, over the probable cause threshold). Independent investigation may provide an inference of "abnormal activity" raising a reasonable suspicion of criminal conduct, which combined with the informant's tip may allow a finding of probable cause. *United States v. Sumpter*, 669 F.2d 1215 (8th Cir. 1982) (an anonymous informant's tip which by itself fails to meet the *Aguilar* tests results in a finding of probable cause when considered with the rest of the information provided in the affidavit). *See also United States v. Hirschhorn*, 649 F.2d 360 (5th Cir. 1981).

But what kind of corroboration is necessary where the tip comes from an anonymous informant? Several recent cases from other circuits (*see, e.g., United States v. Button*, 653 F.2d 319 (8th Cir. 1981); *United States v. Rasor*, 599 F.2d 1330 (5th Cir. 1979); *United States v. Smith*, 598 F.2d 936 (5th Cir. 1979)) have held the agents' independent investigations to be inadequate to bootstrap to the anonymous informant's tip so as to result in a finding of probable cause. In these cases, there had been corroboration only of "innocent details," instead of details providing direct or circum-

stantial evidence of criminal activity. The Seventh Circuit seems rarely to have passed on the question of corroboration of an anonymous informant's tip in the context of a finding of probable cause to issue a warrant.[6] *United States v. Roth*, 391 F.2d 507 (7th Cir. 1967) seems to be the only decision in this Circuit which may be said to pass on a question similar to the one presented by these facts.

In *Roth*, FBI Agent Morrison swore in an affidavit made in application for a search warrant that he had received information from a confidential informant that electric blenders stolen from a truck were contained in a particular warehouse. Morrison stated that the informant was reliable, but gave no underlying circumstances which would allow the magistrate to determine whether the informant was actually reliable. The affidavit went on to state that another FBI agent, Thomas Noonan, had informed Morrison that Noonan had seen a number of boxes bearing the name of the manufacturer of the stolen electric blenders in the same warehouse described by the confidential informant.

The court found that the informant's tip did not satisfy the *Aguilar* standards, and the corroborating details provided by agent Noonan were not "sufficient in themselves to establish probable cause." *United States v. Roth, supra*, at 511. The court distinguished the decision in *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), by stating that in *Ventresca* "seven instances of the agents' observations of suspicious, incriminating activities were described" whereas Agent Noonan merely observed a warehouse containing "a product that is mass produced by a nationwide manufacturer of a variety of household electrical appliances." *United States v. Roth, supra*, at 511. The inference must be drawn that corroboration or observation

of "suspicious, incriminating activities" will boost an inadequate tip over the threshold; corroboration of only innocent details may not. *Roth* addresses the case of the corroboration of only innocent details provided by an anonymous informant.

*United States v. Ware*, 457 F.2d 828 (7th Cir.), *cert. denied* 409 U.S. 888, 93 S.Ct. 139, 34 L.Ed.2d 145 (1972), although a somewhat different case, may help to shed some light on the question presented here. In *Ware*, an Indiana policeman named Green received an anonymous telephone call stating that a "1963 white over gold Cadillac" parked at a certain address in Gary had been stolen in Illinois. When Green found the car at the location described by the anonymous caller, he checked the license plate number of the Cadillac by radio and learned that the license plate was registered to an Arthur Berry. When he saw the defendant Ware, whom Green knew by name, get into the car and drive away, he pulled alongside and forced the defendant to pull over. A Detective Allen then joined Green. Allen knew that the defendant's driving privileges had been suspended. Green thereupon checked the driver's license and registration proffered by the defendant. Upon finding that neither was in the defendant's name, Green arrested him. A check of the vehicle identification number at the police station revealed that the car was indeed stolen.

*Ware* is different from the case now before the Court in two ways: (1) The trial court found that a search had been conducted, but that under the circumstances it was permissible. In affirming the trial court, the court of appeals stated that if this was a search, it was permissible. However, in its view the check of the vehicle identification number had not really amounted to a search. Dissenting Judge Kiley agreed with the trial court that this had been a search, but stated that he believed it had

---

**6.** But *cf. United States v. Hernandez*, 486 F.2d 614, 616–617, n.2 (7th Cir. 1973) *cert. denied* 415 U.S. 959, 94 S.Ct. 1488, 39 L.Ed.2d 574 (1974) (anonymous informant's tip which provided innocent details corroborated by police investigation enough to allow an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct.

1868, 20 L.Ed.2d 889 (1968), though it was insufficient to support an arrest or search warrant). For a collection of cases concerning anonymous tips as the basis for *Terry* stops, *see United States v. White*, 648 F.2d 29, 43 (D.C.Cir.), *cert. denied* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981).

been conducted without probable cause. (2) No warrant was sought for the arrest of the defendant or for any search of the vehicle.

Even recognizing these differences, *Ware* is still helpful. The appellate court agreed with the trial court's decision that "if, indeed, this was a search," it was permissible. *Ware, supra*, at 830. In *Ware*, the officer received an anonymous telephone call clearly inadequate under *Aguilar*. But the corroboration of the informant's conclusion, provided by the independent investigation and knowledge of the officers, did provide probable cause to perform this search. The officers knew the identity of the driver of the car. They learned that he did not own the vehicle, and an investigatory stop showed that he was carrying false identification papers. Thus this observation of suspicious activity affirmed the anonymous informant's tip and amounted to probable cause.

*Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), sets out the standard. In *Spinelli* the Court found the warrant insufficient under *Aguilar*, because the corroboration of detail provided by the agent was of "innocent-seeming activity and data . . . [which] could hardly be taken as bespeaking gambling activity . . ." 393 U.S. at 414, 89 S.Ct. at 588.

The corroboration and independent investigation by the FBI agents here provide the corroboration necessary to boost the informant's tip over the probable cause threshold. FBI surveillance showed Johnson leaving the theatre at approximately 11:45 p. m.

on June 10, 1981, making two separate trips from the theatre to his automobile. During these trips, Johnson took objects from the theatre and placed them in the automobile. At 12:15 a. m. on June 11, 1981, thirty minutes after Johnson left the theatre, the agents determined that the movie "Raiders" was missing, and that Johnson had no permission to take "Raiders" from the theatre.

■ The fact that the film "Raiders" was missing within thirty minutes of Johnson's departure, in accord with the informant's tip that Johnson would remove the film from the theatre on that particular night, does bespeak criminal activity. While the Court believes this is a close question, it must apply the "established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause . . . ; that affidavits of probable cause are tested by less rigorous standards than those governing the admissibility of evidence at trial . . . ; that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense . . . ; and that their determination of probable cause should be paid great deference by reviewing courts . . ." *Spinelli v. United States*, 393 U.S. at 419, 89 S.Ct. at 590–91 (citations omitted). Therefore, the Court finds that probable cause existed to allow the warrant to issue. The motion to suppress the evidence seized at the time of the search is denied.[7]

7. The defendants have raised several other arguments attacking the affidavit. Those which address the question of the copyright laws are answered below in Section IV, ruling on the motion to dismiss the indictment.

Defendants also contend that the affidavit contained an erroneous statement, made by Layhew of the Film Security office, that the "registration [was] pending" for "Raiders" as of June 11, 1981. This appears to be controverted by the Certificate of Registration from the copyright office which shows that the application for copyright registration was made on August 11, 1981. (The government ignores this issue). The fact that the affidavit contained an arguably erroneous statement made

by Layhew does not void the entire affidavit. The alleged removal of the film by Johnson without permission was a criminal act, whether or not the registration was in fact pending. There is no allegation that Layhew or the affiant Misner made a knowing falsehood in the affidavit. But even if this were a knowing falsehood, probable cause existed for the issuance of the warrant though this particular statement is ignored. *Cf. Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Defendants further argue: "The warrant in this cause was obtained after the entry into the premises." This is clearly without merit: the affidavit was signed at 3:03 a. m. on June 11,

## II. Motions to Suppress Statements

Defendants Stevens, Cotsirilos, and Shlagman have brought motions to suppress as evidence any statements given by them on June 11, 1981, on grounds of the failure to give warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). They also seek to suppress any subsequent statements under the doctrine of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Cotsirilos also has brought a motion to suppress statements made on July 9, 1981, stating two grounds: (a) the failure to give *Miranda* warnings; and (b) that the statements were made involuntarily, and were due to promises and/or threats made to defendant Cotsirilos and his girlfriend.

### A. Statements Given on June 11, 1981

■ The statements allegedly made on June 11, 1981, were taken during a search of premises leased by defendant Stevens incident to the execution of a search warrant which this Court has found to be lawful. The protections afforded by *Miranda* are applicable to a "custodial interrogation," meaning questions or interrogation "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. Accordingly, the Court is required to determine whether or not the statements in question were obtained by agents of the FBI after defendants were taken into custody or otherwise deprived of freedom in any significant way. Pursuant to 18 U.S.C. § 3501, the Court also must as an independent matter consider whether the statements were voluntary.

Based on the testimony presented by three FBI agents (Phelps, Steed, and Misner) and the three defendants (Stevens, Cotsirilos, and Shlagman) during three days of hearings held on June 16, 17, and 18, 1982, the Court finds as follows:

1. On June 11, 1981, at 3:10 a. m., agents of the FBI lawfully entered a building at 531 West Wrightwood, Elmhurst, Illinois, for the purpose of searching for evidence in violation of the Copyright Act, 17 U.S.C. § 506(a), and evidence of interstate transportation of stolen goods, in violation of 18 U.S.C. § 2315.

2. The building searched houses the business of defendant Stevens. The equipment on the premises belonging to Stevens had an estimated value of one-half million dollars. The estimated value of the equipment seized belonging to defendants Cotsirilos and Shlagman was approximately $500.00.

3. Agent Phelps was the first agent to enter the premises. Upon entering the building, he saw four persons near the front door, heard what he believed to be the

1981, and the warrant was executed at 3:10 a. m. on June 11, 1981.

The defendants' final argument is that the affidavit is deficient in that it does not allege that any of the defendants "were making any willful infringement of a copyright of a movie picture for purposes of commercial advantage or private gain." This too is without merit. In *United States v. Bily*, 406 F.Supp. 726 (E.D.Pa.1975), cited by the defendants, the affidavit was found defective because it did not allege wilful infringement for profit. Mr. Bily was a collector of motion picture films. As a collector, his mere possession could have been entirely innocent. Without a showing that the defendant had committed wilful infringement for profit, the simple possession of the films was not enough to show a reasonable suspicion of criminal activity. In short, probable cause to believe a crime had been committed did not exist.

"Once it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the Magistrate has probable cause to believe may be the place of concealment of 'fruits, instrumentalities, or evidence." *Zurcher v. Stanford Daily*, 436 U.S. 547, 558, 98 S.Ct. 1970, 1978, 56 L.Ed.2d 525 (1978), quoting *United States v. Manufacturers National Bank*, 536 F.2d 699, 703 (6th Cir. 1976), *cert. denied* 429 U.S. 1039, 97 S.Ct. 735, 50 L.Ed.2d 749 (1977). Here there was probable cause to believe a crime had been committed—the print of "Raiders" was missing from the theatre without permission of the theatre owner—and due to the FBI surveillance which tracked Johnson's travels to 531 W. Wrightwood, Elmhurst, Illinois, there was probable cause to believe that the fruits of the crime were on the premises to be searched. There was no need to allege wilful infringement, and *Bily* is inapposite.

sound of someone leaving the rear of the building, and immediately went to investigate. He never drew his weapon. At the time of the search, defendants Stevens, Cotsirilos, Shlagman, and another person identified as a Mr. Weitzman, were in a room adjacent to the entrance of the building apparently playing cards. Cotsirilos asked one agent if they had a search warrant. The agent replied that one had been signed and that it was "on its way." An agent also stated that they "had the right to detain" those on the premises.

4. While the testimony is somewhat in conflict as to whether the second agent entering the premises entered with a drawn weapon, the Court finds that the second agent entered the building with a weapon drawn, which remained drawn for several minutes until the building was secured. Some of the agents who later entered the premises during the search wore sheathed weapons. With the exception of the single weapon drawn during the first few minutes of the entry and the beginning of the search, no weapons were drawn during the search of the building or the interviews of the occupants.

5. Defendants Stevens, Cotsirilos, and Shlagman, and Mr. Weitzman, were interviewed by agents conducting the search for the purpose of obtaining their identities and learning what they were doing in the building. At no time during the evening were *Miranda* warnings given to any of the defendants. Prior to the search, the agents had been informed that no one was to be arrested.

6. After securing the building, Agent Phelps had casual conversation with some of the defendants. Phelps did not record these conversations, and does not recall them.

7. Agent Steed has had somewhat extensive experience investigating cases of criminal copyright infringement. He arrived at the premises approximately forty-five minutes after the search had begun. He interviewed Stevens, Cotsirilos, and Shlagman separately. The three interviews, combined, lasted approximately 30 minutes. Steed identified himself, told them they were not under arrest, and said that he wanted to find out who they were and what they were doing on the premises. Steed testified that as far as he was concerned, the defendants were free to go when he had finished these interviews. He did not, however, inform the defendants that they were free to go when the interviews were concluded.

8. Shlagman testified that after his interview with Agent Steed, he asked if he could leave, and that Steed replied that Shlagman should "just sit down on the couch." Steed's testimony directly contradicts Shlagman. The Court, finding much of Shlagman's testimony inconsistent and some of it inherently unbelievable, resolves this conflict by finding Steed's version to be accurate.

9. After being questioned, Weitzman left the premises alone to obtain coffee and soft drinks. He returned to the building and distributed the refreshments. He then left the building and did not return.

10. Agent Misner has had extensive experience investigating cases of criminal copyright infringement and was the agent in charge of this investigation. He arrived between 5 and 6 a. m. Weitzman had already departed. Misner interviewed Cotsirilos and Shlagman together, and conversed with Stevens alone. Prior to his arrival, Misner had been informed by radio that the defendants were on the premises. He hoped they would still be there when he arrived, but specifically told the agents involved that no arrests were to be made.

11. During the evening, Cotsirilos asked to use the washroom. He was escorted to the washroom by agents, and was told by them to keep the door open. Stevens also desired to go to the washroom, but refused to use the facilities with the door open.

12. During the search, defendants Shlagman and Cotsirilos informed the searching officers that they owned some of the equipment on the premises. Stevens showed the searching officers the equipment on the premises. Stevens gave a

942

handtruck to the officers to help them move the equipment to the truck brought by Misner. Cotsirilos was asked, and consented, to accompany some agents to identify a person outside the building who was ill. Cotsirilos identified the person as defendant Heck. Heck, who apparently had had a heart attack, was taken by ambulance to a hospital.

13. The search resulted in the seizure of a large quantity of electronic equipment which was the property of defendants Stevens, Cotsirilos and Shlagman. The equipment seized was quite heavy. Until Agent Misner arrived at the premises at approximately 5:30 a. m. with a truck, the seized equipment could not have been transported from the premises. The search and seizure ended at 7:35 a. m. Stevens, Cotsirilos and Shlagman remained at the premises for some time after the agents left.

The government has vigorously argued that *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), is controlling authority demonstrating that the limited detention of these defendants was permissible. The government, however, misapprehends the holding and significance of *Summers*. A fair reading of this important case shows that it does not support the government's contention. In fact, *Summers* strongly suggests that the statements given by these defendants during their detention must be suppressed.

The police officers in *Summers* arrived at the defendant's house with a validly issued search warrant authorizing a search of the premises. Upon their arrival, they found the defendant leaving his residence. The officers detained the defendant and the eight occupants of the house while conducting the search, which uncovered two plastic bags of suspected narcotics in the basement of the house. After determining that the defendant was the owner of the house, one of the officers arrested the defendant and performed a search incident to arrest, which revealed a plastic bag containing heroin. The defendant was charged with possession of the heroin found on his person, and he moved to suppress the seized heroin as the product of an illegal search in violation of the Fourth Amendment.

The Court held that the limited detention of the defendant during the execution of this validly issued search warrant did not violate the proscription against unreasonable searches and seizures. The Court stated that it is not unreasonable to detain citizens during the performance of a valid search so as (1) to prevent flight in the event that incriminating evidence is found, (2) to minimize the risk of harm to officers and occupants during the search, and (3) to facilitate the examination of the premises.

The government in the case before this Court is correct in stating that under *Summers*, the detention of the defendants during the execution of this valid search warrant was not improper. However, this fails to address the issue presented by these defendants' motion to suppress. The question is not whether the agents had the right to detain the defendants during the search. Rather, the question is whether statements obtained during this detention must be suppressed.

The Court in *Summers* did not directly address this question because it was not faced with it. The evidence which Summers sought to suppress was *physical evidence* seized from him *after* his arrest. By contrast, the evidence which the government seeks to introduce in this case are *statements* made by the defendants in the absence of *Miranda* warnings some nine months *before* their formal arrests.

Thus *Summers* is two steps removed from the facts before this Court. First, the evidence in *Summers* was property seized from the person, in arguable violation of the defendant's Fourth Amendment rights. In this case, the challenged evidence are statements, obtained in arguable violation of the defendants' Fifth Amendment rights. Second, the evidence seized from Summers was obtained after his arrest. Here, the statements were made long before arrests were made. The holding in *Summers* provides the government no support for its position.

In fact, *Summers* indicates that the statements obtained here, during an otherwise

lawful detention, might well have to be suppressed. In showing how *Summers* was a different case from *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), where the defendant was "taken in" to a police station without probable cause, confessed, and then was formally arrested, the Court said:

> Moreover, unlike the seizure in *Dunaway*, which was *designed to provide an opportunity for interrogation and did lead to Dunaway's confession*, the seizure in this case is not likely to have coercive aspects likely to induce self-incrimination.

*Summers, supra*, 452 U.S. at 702 n.15, 101 S.Ct. at 2593 n.15. (emphasis added). *See also United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980) (initial detention a prelude to custodial interrogation), *aff'd on other grounds,* —— U.S. ——, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). The detention in this case probably had two "designs." The first design, permissible under *Summers*, was to allow the proper execution of the search warrant. The second design was apparently "to provide an opportunity for interrogation..."

This is not speculation on the part of the Court, but rather is the only fair reading of the testimony. Agent Steed testified that he did not consider the defendants free to leave until after he had questioned them. His questioning of them began forty-five minutes after the search had begun.[8] The length of the detention and the fact that Steed questioned them at all are not the problems. Given the nature of the evidence to be seized in this search, i.e., heavy video equipment, and the fact that the agents could not transport this property until the arrival of Agent Misner with a truck, the detention for one hour and fifteen minutes does not seem to be unreasonable. *Cf. United States v. Timpani*, 665 F.2d 1 (1st Cir. 1981) (forty-five minute detention during search not unreasonable). In addition, Steed's asking each of the defendants basic

identification information was not improper. It was entirely reasonable for him to find out who was on the premises at the time of the search so that he or another agent could contact these persons in the future.

> Ordinarily, the routine gathering of background biographical data will not constitute interrogation. *United States ex rel. Hines v. La Vallee*, 521 F.2d 1109, 1112–13 (2nd Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). *See also United States v. Lamonica*, 472 F.2d 580 (9th Cir. 1972) (inventory of suspect's belongings).

*United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981).

But Steed's questioning went beyond "the routine gathering of background biographical data."

> [W]e recognize the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect. Thus we emphasize that the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response.

*Booth, supra*, at 1238. After he asked the defendants who they were, Steed asked them what they were doing on the premises. Obviously, this question was reasonably "likely to elicit an incriminating response," and it did so. This was interrogation.

But was it custodial interrogation? Each of the agents testified that they were directed not to place the defendants under arrest, and each testified that he did not do so. It is clear that the defendants were not in fact placed under formal arrest. But this factor is irrelevant to the consideration of whether the defendants were in fact

---

**8.** It is interesting to note that the defendants were not asked routine identification questions by the first agents on the scene. Instead, this was reserved until Steed, a specialist in the copyright field, arrived forty-five minutes later. Clearly, the agents wanted someone with expertise to speak with the defendants. It suggests that their "design" was not an innocent one.

placed in a custodial situation. *Dunaway v. New York, supra.* Steed testified that as far as he was concerned, the defendants were free to leave after he interviewed them. The obvious corollary was that they were *not* free to go before he interviewed them. Thus Steed has admitted, in effect, that the defendants were in custody, and that their freedom was most definitely restricted in a significant way. Asking them questions during this detention, without providing *Miranda* warnings, was improper.[9] This was a detention for the purpose of providing an opportunity for interrogation which led to confessions, *see Summers, supra,* at 702 n. 15, and the statements made to Steed must be suppressed.

*United States v. Timpani,* 665 F.2d 1 (1st Cir. 1981), does not dictate a different result. In *Timpani,* FBI agents searched the defendant's house pursuant to a validly issued search warrant. During the first forty-five minutes of the five hour search, the agents insisted that Timpani remain with them, and also prohibited him from telephoning his lawyer or anyone else. During this period, the defendant "tried to dissuade the agents from searching further by saying, 'You've got everything; you got more than you want; more than you came for. You've got it all.' The agents looked further and found a sawed-off shotgun. [Defendant] again stated, 'You've got everything. There's nothing else.'" *Timpani, supra,* at 2. The defendant sought to suppress these statements.

The court found that the forty-five minute detention of the defendant during the initial performance of the search was permissible under *Michigan v. Summers.* Furthermore, the defendant's statements were admissible even in the absence of *Miranda* warnings because "[t]he agents made no effort, overt or subtle, to interrogate appellant or to elicit from him in any way any incriminating statements." Since "[v]olunteered statements of any kind are not barred," *Timpani, supra,* at 3, quoting *Mi-*

randa v. Arizona, 384 U.S. at 478, 86 S.Ct. at 1630, the volunteered statements made by Timpani were admissible.

█ In *Timpani,* as in *Summers,* the law enforcement officers went about their business conducting a lawful search. No interrogation, no questioning, no interview was conducted. In the instant case, each of the defendants was interviewed and asked questions during a period when he was not free to leave. The detention was permissible for the purpose of conducting the search. *Summers.* It even was permissible for the purpose of asking the defendants to identify themselves. *United States v. Booth, supra.* But it was not permissible for the purpose of asking questions designed to elicit incriminating statements. *Dunaway v. New York, supra; see Summers, supra,* 452 U.S. at 702 n. 15, 101 S.Ct. at 2593 n.15.

█ The next question is whether the subsequent statements made by the defendants must be suppressed on the same grounds as those made to Steed, or whether they must be suppressed as the fruits of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). There are three groups of subsequent statements at issue: (1) those made by the defendants to Agent Misner on June 11, 1981; (2) those made by Cotsirilos to Misner on July 9, 1981; (3) those made by Stevens to Misner after June 11, 1981. The first group is here analyzed under both the *Wong Sun* and *Miranda* doctrines. The second and third groups are also considered here under the "fruits" analysis, while any alleged *Miranda* violations are discussed below in Parts II.B. and III.

Steed questioned the defendants between 3:45 a. m. and 4:15 a. m. Agent Misner spoke with the defendants between 5 and 6 a. m. As mentioned above, Steed testified that as far as he was concerned the defendants were free to leave after he had questioned them. Misner stated that he hoped the defendants would still be on the premis-

---

**9.** The Court does not pass on the issue of whether questioning after *Miranda* warnings are given, during a permissible detention where

there may be no probable cause to arrest, is improper.

es by the time he arrived, but that he gave instructions that no one was to be arrested. Thus on its face, it seems that from the agents' viewpoints the defendants did not remain in a custodial setting after Steed's questioning terminated.

The inferences which can reasonably be drawn from the testimony, however, do not clearly show whether the defendants actually remained in a custodial setting after Steed's interviews ended. On the one hand, Weitzman left, returned with refreshments, and left again. By the time Misner arrived, Weitzman was finally gone. This might indicate to the defendants that if Weitzman were free to leave, they too could leave whenever they chose. The government also made a credible argument that the reason the defendants stayed throughout the search was to protect the property they owned at the premises.

On the other hand, Cotsirilos and Stevens asked if they could use the washroom. One may infer from the fact that they asked for such permission that they felt their freedom was significantly restricted. The agents' reply—that they could use the washroom if they were escorted by agents and if the door were kept open—implies that their freedom was in fact restricted. It may be argued that while the defendants were free to leave the premises entirely (as did Weitzman), if they chose to stay on the premises during the search, then their freedom could be restricted to allow no interference with the search operation. *See Summers, supra.* Such a restriction on movement within the premises being searched would not necessarily require the suppression of the statements made to Misner.

The Court has carefully evaluated all the factual and legal arguments, and has decided not to decide the question of the admissibility of the statements made to Misner on the basis of *Miranda.* Instead, the fairest and most common sense approach would be to consider this as a fruits problem under *Wong Sun* and its progeny.

The Supreme Court quite recently has faced the fruits issue once again. In *Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), the Court found that a confession given six hours after an arrest made without probable cause must be suppressed. The "intervening events" pointed to by the state, such as the giving of *Miranda* warnings three times, the defendant's visit with his girlfriend and a male friend, and the filing of an arrest warrant, were found insufficient to break the causal connection between the illegal arrest and the confession so that the statements were "sufficiently an act of free will to purge the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

As stated above, the questioning by Steed occurred in a custodial situation, though unlike *Taylor* but like *Dunaway,* the defendants had not been formally arrested. The question of whether this custodial situation continued to the point of Misner's questioning is problematic. But given the fact that some forty-five minutes prior to the time Misner spoke with the defendants they had made statements to Steed, any arguably perceptible difference in their situation (Weitzman's departure) cannot be determinative. They had spoken with one agent and now were speaking to a second, repeating the same information they had given the first. No *Miranda* warnings had been given to attempt to break the causal connection.[10] After Steed finished his interviews, he did not tell the defendants that they were free to go. In reality, there were no "intervening events." The illegal questioning by Steed so infected the subsequent questioning by Misner a short time later that these statements made to Misner also must be suppressed.

The statements made by Cotsirilos on July 9, 1981, (the relevant facts are set forth in Part II.B., below), however, need not be suppressed as fruits of the poisonous tree. Four weeks had elapsed between the

---

**10.** Of course such a step would not necessarily achieve the desired effect; *Miranda* warnings are not "talismans" that cure all Fourth Amendment violations, *Taylor v. Alabama,* —— U.S. at ——, 102 S.Ct. at 2668.

questioning on the night of the search and Misner's appearance at Cotsirilos' house. The agents who spoke with Cotsirilos on July 9, 1981, were not present pursuant to a search warrant, but asked for and received permission to speak with Cotsirilos at home. Cotsirilos refused to consent to the search of his basement. He could just as well have refused to allow them the initial entry. No reasonable argument can be made that Cotsirilos' subsequent statements were not purged of their primary taint.

Stevens' later statements to Agent Misner (see Part III., below) also need not be suppressed on *Wong Sun* grounds. Stevens' first meeting with Misner after the June 11, 1981 search was on June 29, 1981. Misner had come to Stevens' place of business to return a handtruck which Stevens had lent to him on the night of the search. Two and one half weeks had gone by. Stevens' knew he could decide to speak with Misner or not, as he chose. Any relevant statements of Stevens subsequent to June 29, 1981—and the Court is aware of none—would also not be inadmissible.

The Court denies the collateral motions to suppress statements made after June 11, 1981.

### B. *Cotsirilos' Statements of July 9, 1981*

■ Defendant Cotsirilos seeks to suppress statements made by him to Agent Misner on July 9, 1981, and apparently he urges two grounds in support of his motion: (1) that the statements were made without *Miranda* warnings having been given; and (2) that the statements were made involuntarily, as a result of threats and/or promises made to Cotsirilos and Diane Brown, his girlfriend. Based on the testimony given by Agent Misner, Cotsirilos, and Diane Brown, the Court finds as follows:

1. On July 9, 1981, Agent Misner and another FBI agent named Carroll knocked on the door of the house rented by Cotsirilos and his girlfriend. After identifying himself and Agent Carroll, Misner asked if they could come in to talk to Cotsirilos; and Cotsirilos allowed them to enter.

2. Cotsirilos asked the agents to sit in the dining room, which they did. No *Miranda* warnings were given.

3. They began by talking about the search of June 11, 1981. Misner indicated that Cotsirilos was probably in trouble, and Cotsirilos acknowledged that he understood that.

4. Conversation ensued during which Cotsirilos indicated that he might be engaged in the "bootleg" duplication of movies. As described by Misner, he and Cotsirilos were "playing games" with each other. Much of the discussion was of a hypothetical nature.

5. Cotsirilos left the room to go to the washroom. He did not tell the agents that they could not walk around the room. When Cotsirilos was gone, Misner saw approximately six videotapes on a dresser in the dining room, which were in plain view. Misner recognized from the labels on them that they were tapes of movies which the copyright owners had not authorized to be duplicated.

6. On Cotsirilos' return from the washroom, Misner indicated that he knew these tapes were illegal duplications. Misner confiscated them and gave Cotsirilos a receipt, which Cotsirilos signed. The government does not seek to introduce these tapes into evidence in this cause.

7. Cotsirilos indicated that he might have 1,000 other tapes in his basement, along with videotape equipment. Misner asked if Cotsirilos would consent to Misner's searching the basement to see this material. Cotsirilos refused.

8. Misner then asked if Diane Brown, Cotsirilos' girlfriend, would come into the dining room. Ms. Brown came into the dining room, and Misner asked her if she would permit Misner to search the basement. Ms. Brown refused to allow Misner to perform such a search.

9. Misner then said that he could leave his fellow agent at the house while Misner went to obtain a search warrant for the premises. He said that if after obtaining a warrant a search turned up evidence of illegal activities, those who lived in the

house, including Ms. Brown, could face criminal liability. If, on the other hand, they permitted Misner to conduct a search without obtaining a warrant, Ms. Brown might not be in trouble. Cotsirilos and Ms. Brown testified that the agents said that it would be unfortunate if Ms. Brown, a mother of two children, were forced to go to jail, leaving her children motherless. Misner did not testify as to such a conversation. For the purpose of deciding this motion, the Court finds that such statements were made.

10. Cotsirilos said that before allowing Misner to search his basement, he wanted to speak to his uncle, an attorney. Misner and his fellow agent left the house shortly after this.

The Court concludes, based on these facts and the law stated above, that this was not a custodial interrogation requiring *Miranda* warnings, and that no statements were made as a result of a promise or threat which must be suppressed in this action. The interview of July 9, 1981, was conducted in Cotsirilos' home. He consented to the interview. No statements sought to be introduced in this action were made after the alleged "threats" to Ms. Brown.

Furthermore, this case is unlike *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), seemingly relied on by Cotsirilos though he has not cited it to the Court, in determinative ways. In *Lynumn*, the defendant made statements incriminating herself after being told that she would go to jail and her children would be left motherless. In this case, neither Ms. Brown nor the defendant Cotsirilos made any statements—nor did they consent to a search—after the alleged threat was made to Ms. Brown. Cotsirilos' motion to suppress statements made on July 9, 1981, is denied.

III. *Stevens' Motion to Dismiss the Indictment or, in the Alternative, to Suppress*

██ Stevens and Agent Misner had a series of contacts between June 11, 1981 and August, 1981. Stevens seeks a dismissal of the indictment based on the alleged

breach by the government of a promise of immunity given in exchange for Stevens' cooperation. Based on the testimony given by Misner and Stevens, the Court finds as follows:

1. In the several months following the search of his business premises, Stevens and Misner had a number of telephone conversations and several meetings. Stevens met with Misner at Stevens' place of business, called Misner at his office, and twice ate lunch with Misner at restaurants. Some of these conversations and meetings were initiated by Stevens, and some were initiated by Misner. At no time did Misner give Stevens the *Miranda* warnings. Stevens did not speak to an attorney during this period about the search of June 11, 1981, or his dealings with Misner.

2. On August 7, 1981, Stevens called Misner to say that he wanted to get together to talk, that Stevens wanted "to get out of this thing." This same day, they met at a restaurant. Stevens said he would cooperate with Misner, but he would not testify before a grand jury or at trial. Misner said he had no authority to "make a deal" with Stevens, and that only the Assistant United States Attorney ("AUSA") had the authority to do so. Misner said he would talk to the AUSA.

3. A number of times during their series of meetings and conversations, Stevens asked Misner if he had spoken with the AUSA about Stevens' desire that no charges be brought against him. Misner said that he had not spoken to the AUSA, but that Stevens' cooperation would be made known. Misner never spoke to the AUSA about the possibility of granting Stevens' immunity for Stevens' giving information to the FBI. Misner did send the "302" reports he prepared as a result of his discussions with Stevens to the AUSA.

4. In mid-August, 1981, Stevens arranged for a meeting between Misner and an informant who Stevens believed would help Misner in his investigation.

5. At no time did Misner tell Stevens that he would not be prosecuted for the events occurring on June 11, 1981.

6. Stevens never communicated with the AUSA.

7. None of the conversations between Misner and Stevens after June 29, 1981 related to the events of June 11, 1981.

Stevens' motion to dismiss the indictment must be denied. This is not the kind of gross abuse of governmental power which the Court in *United States v. Pascal,* 496 F.Supp. 313 (N.D.Ill.1979), found required the dismissal of the indictment with prejudice. Here Misner told Stevens that the decision whether to prosecute was with the AUSA, and that Misner had no authority to "make a deal." He also told Stevens that he had not spoken with the AUSA. A promise not to prosecute was not the quid pro quo for Stevens' cooperation. Stevens spoke to Misner in the hope that Misner would prevail on the AUSA not to prosecute, even though Stevens knew that Misner had no such power. In short, no promises were made, and therefore none were broken.

In the alternative, Stevens has moved that his statements be suppressed. This too must be denied. The statements Stevens made after June 11, 1981, were voluntary and were not made in custodial situations. None of the statements made after the first time Stevens even suggested a "deal" dealt with the events of June 11, 1981, which are the acts the indictment charges Stevens with having committed.

### IV. *Motion to Dismiss Indictment*

■ The defendants have joined in a motion to dismiss the indictment apparently based upon two theories. First, that the warrant pursuant to which evidence was seized, which evidence was later presented to the grand jury, was deficient. They argue that since the affidavit for the search warrant stated that the movie "Raiders" had been copyrighted and that the registration was pending, but the film "Raiders" was not copyrighted and the registration was not pending as of the date of the issuance of the warrant, the affidavit was erroneous and the search warrant was therefore improperly issued. As a consequence, the argument goes, any material seized pursuant to this improper affidavit and search warrant should not have been presented to the grand jury, and therefore the indictment should be dismissed. The argument concerning "registration" has been disposed of in n. 7.

The second part of the defendants' first theory—that "Raiders" did not exist under a "copyright"—is also a component of the defendants' second thesis: since "Raiders" was not copyrighted and the registration was not pending at the time of the alleged infringement on June 11, 1981, there could have been no violation of 18 U.S.C. §§ 2315 and 2, or 17 U.S.C. § 506(a) and 18 U.S.C. § 2.

These arguments are completely without merit. Since Count II of the indictment alleges that the defendants received a stolen copy of "Raiders," the question of copyright or registration is entirely irrelevant. The only relevant question pertaining to Count II of the indictment is whether the film was allegedly stolen. The defendants make no statement that they lawfully possessed the film "Raiders" found at the location searched in Elmhurst, Illinois.

Count IV of the indictment alleges violations of the copyright laws under 17 U.S.C. § 506(a) and 18 U.S.C. § 2. Thus was "Raiders" copyrighted as of June 11, 1981? As the Certificate of Copyright Registration shows, the date of "publication" of "Raiders" was May 29, 1981. "Publication" is defined as "the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . ." "A work is 'created' when it is fixed in a copy . . . for the first time. . . ." 17 U.S.C. § 101. A work obviously cannot have been "published" unless it has already been "created." Since a copyright "subsists from its creation . . ." 17 U.S.C. § 302(a), it necessarily follows that a copyright must exist in a work which has already been published. Thus, May 29, 1981 is the latest date possible for "Raiders" to have achieved the status of a copyrighted work.

The statement in Count IV of the indictment that on or about June 11, 1981, "Raiders" had been copyrighted and also "was duly registered" does not require dismissal of the indictment. The film was copyrighted as of that date, and infringing a copyright is a criminal act. 17 U.S.C. § 506(a). Though the statement that it also "was duly registered" may be erroneous, it is mere surplusage which does not require dismissal of the indictment. *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927). The motion to dismiss the indictment is denied.

### V. *Motion for Bill of Particulars*

■ The defendants have joined in a motion for a bill of particulars requesting the description of the value the government has placed on the films named in the indictment. In addition, and apparently pursuant to Rule 16(a)(1)(C) of the Fed.R.Crim.P., the defendants have asked for a pretrial inspection of any documents and tangible objects within the possession, custody, or control of the government which are intended by the government for use as evidence in chief at the trial of this action. These requests are granted.

■ Defendants in their motion for bill of particulars have also requested the government to disclose with specificity the date and time at which the search warrant in this matter was issued. Counsel have represented to the Court that the government has done this, and based on this representation this paragraph in the motion for a bill of particulars is denied.

### VI. *Brady Motions*

■ Defendants Shlagman, Cotsirilos, and Heck have filed "motions for production of exculpatory material" pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These requests ask for (1) the name and address of every person the government has interviewed in connection with this case but whom the government does not intend to call as a witness at trial, (2) the recorded statements of such persons, and (3) "material of any kind whatsoever bearing upon the guilt or innocence of the defendants or upon the credibility of any witness or the reliability of any tangible evidence."

The government in its brief has represented to the Court that pursuant to *Brady v. Maryland* and Local Rule 2.04, "the United States has made available what exculpatory materials for these defendants that it has." Based on this representation, this part of request No. 3 is denied. Requests for information pertaining to persons interviewed by the government whom the government does not intend to call as witnesses are also denied. If statements from such persons are exculpatory the government has represented that this material has been provided to the defendants. If the material is not exculpatory, the defendants have no right to require the government to turn over this material.

In their *Brady* motions, the three defendants mentioned above have in essence joined with defendant Stevens (who filed a separate motion entitled "Motion to Produce Evidence Concerning Inducements, Promises, and Compensation to Prospective Government Witnesses") in asking the government to state whether any favorable considerations whatsoever have been made to any witness in this case.

The government has represented to the Court that it will disclose in advance of any testimony by any witness all such evidence or information which bears upon the witness' credibility. Pursuant to *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court grants these parts of defendants' motions. One week prior to trial of this action, the government must disclose to defendants any evidence or information bearing upon the government's witness' credibility, with the exception of material described in 18 U.S.C. § 3500.

IT IS THEREFORE ORDERED:

(1) That the motions to suppress evidence seized pursuant to the search warrant are denied.

(2) That the motions to suppress statements made on June 11, 1981, are granted.

(3) That the motions to suppress statements made after June 11, 1981, are denied.

(4) That the motions to dismiss the indictment are denied.

(5) That within one week, the government will describe the value it has placed on the films named in the indictment.

(6) That within one week, the government will allow an inspection of all documents and tangible objects within its possession which it intends to use as evidence in its case in chief.

(7) That the defendants' requests for disclosure of the date and time at which the search warrant was issued are denied.

(8) That the defendants' requests for the names and related information of those persons interviewed by the government whom the government does not intend to call as witnesses at trial are denied.

(9) That the defendants' requests for exculpatory material are denied.

(10) That the government will disclose all evidence or information bearing upon the credibility of their witnesses, other than statements as defined in 18 U.S.C. § 3500, no later than one week before trial of this action.