UNITED STATES of America, Appellee,

v.

Joseph A. TIMPANI, Defendant, Appellant.

No. 81–1164.

United States Court of Appeals, First Circuit.

Argued Sept. 16, 1981.

Decided Dec. 1, 1981.

William A. Dimitri, Jr., Newport, R. I., for defendant, appellant.

Victor D. Stone, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Paul F. Murray, U. S. Atty., Providence, R. I., and James H. Leavey, Sp. Atty., North Kingstown, R. I., were on brief, for appellee.

Before CAMPBELL, VAN DUSEN,* and BREYER, Circuit Judges.

BREYER, Circuit Judge.

On June 8, 1979, the FBI conducted a coordinated series of searches for contraband and evidence related to loansharking and gambling in Providence, Rhode Island. Pursuant to a warrant, they searched appellant's house. For the first forty-five minutes of the five-hour search, the agents insisted that appellant remain with them while they searched. They refused to allow him to telephone his lawyer or anyone else, lest he issue a warning before other searches in the series were underway. During this time, the agents found some records in the bedroom closet. Appellant then apparently tried to dissuade the agents from searching further by saying, "You've got everything; you got more than you want; more than you came here for. You've got it all." The agents looked further and found a sawed-off shotgun. Appellant again stated, "You've got everything. There's nothing else." The agents

then found three loaded handguns wrapped up in socks. The agents took the weapons to their car. They discovered by phone that appellant had a criminal record. They obtained a search warrant for the guns and then seized them. Subsequently, appellant was convicted of possessing an unregistered sawed-off shotgun [1] and unlawfully (as a prior convicted felon) possessing firearms.[2] Appellant challenges these convictions on several grounds.

A. Appellant claims that the series of events just described shows violations of the Fourth, Fifth and Sixth Amendments to the Constitution, in that he was unreasonably detained, deprived of his right to counsel, and not given *Miranda* warnings, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He claims that his statements, set out above, should not have been admitted into evidence.

Several recent Supreme Court cases foreclose appellant's lines of argument. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981), explicitly states that during searches for contraband, "it is constitutionally reasonable to require [the] citizen to remain while officers of the law execute a valid warrant to search his home." One of several rationales that the *Summers* Court advanced to justify this rule is the need to minimize the risk of "sudden violence or frantic efforts to conceal or destroy evidence." 452 U.S. at 702, 101 S.Ct. at 2594. The nature of the criminal behavior underlying the warrant—organized loansharking [3]—and the evidence previously gathered through court-autho-

---

* Senior Circuit Judge of the Third Circuit, sitting by designation.

1. 26 U.S.C. § 5861 states:
    It shall be unlawful for any person—
    .  .  .  .  .
    d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record;

2. 18 U.S.C.App. § 1202(a) states:
    Any person who—
    1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony,

and who receives, possesses or transports in commerce or affecting commerce, after the date of enactment of this Act [June 19, 1968] any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

3. *See generally* Goldstock & Coenen, *Controlling the Contemporary Loanshark: The Law of Illicit Lending and the Problem of Witness Fear*, 65 Cornell L.Rev. 127 (1980).

rized wiretapping, are sufficient to bring this case within both the letter and the rationale of the *Summers* holding.

The fact that the agents initially prevented appellant from calling his lawyer does not change the result under the circumstances present here. There is no evidence that this restriction was related in any way to a desire to deprive appellant of legal counsel. Rather, as the trial court found, the restriction formed a necessary part of a more general restriction, namely, that appellant phone no one until other coordinated searches were underway. Given the organized nature of the underlying crimes, that instruction seems reasonable. Moreover, the restrictions on appellant's freedom were carefully tailored to fit the legitimate need that gave rise to them. They lasted for forty-five minutes of a five-hour search. As soon as the risk of premature warning disappeared, the agents told appellant he was free to telephone and to leave. Further, there were no special circumstances present here calling for the presence of a lawyer. The agents did not intend to arrest appellant. He was not placed under arrest. No arrest warrant had been issued against him. There had not yet been initiated any "judicial proceeding" that would ordinarily call into play a "right to counsel." *Brewer v. Williams*, 430 U.S. 387, 398–99, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). The agents made no effort, overt or subtle, to interrogate appellant or to elicit from him in any way any incriminating statements. *Cf. United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Hence, we see no basis for a Fifth or Sixth Amendment claim, and, as far as the Fourth Amendment goes, we see no reason to depart from the *Summers* holding that the agents are to have "unquestioned command of the situation." 452 U.S. at 703, 101 S.Ct. at 2594.

The fact that appellant was neither arrested nor interrogated also seems sufficient to dispose of his *Miranda* claim. The Supreme Court recently held that *Miranda* safeguards come into play when a person in custody is subjected to either questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court noted that interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689. Indeed, *Miranda* held:

> The fundamental import of the [Fifth Amendment] privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred.

*Miranda v. Arizona*, 384 U.S. at 478, 86 S.Ct. at 1630.

In *Innis*, the Supreme Court held that the following facts did *not* show "interrogation" or its "functional equivalent": Defendant was arrested in connection with two crimes—an assassination and a robbery—in each of which a sawed-off gun had been used. After receiving *Miranda* warnings, he stated he wanted to speak to a lawyer. He was then placed in the back of a police car. His counsel was not present. Two policemen in the front of the car spoke to each other about how unfortunate it would be if a child found the shotgun (presumably the murder weapon). Defendant, overhearing the conversation, told them the gun's location. Defendant's statements were held admissible. Appellant's case here is weaker than *Innis*. He was not under arrest. There is no evidence of any agent statements made within his hearing. Rather, appellant's statements, if elicited at all, were elicited only by the discovery (or likely discovery) of incriminating items during the course of a lawful search. We cannot distinguish this case from *Innis*.

B. Appellant claims that the search warrant was issued without probable cause. We do not agree. The search warrant was based on an affidavit of an FBI agent submitted to a magistrate on June 6, 1979. That affidavit incorporated two earlier affi-

davits (signed in March and April), which had been submitted to obtain permission to use electronic surveillance. The information contained in the three affidavits, obtained from several sources and from electronic surveillance, provides strong grounds for believing that several persons with whom appellant was associated were engaged in gambling and loansharking, with accompanying physical violence and murder. The information connecting appellant directly with this activity is of four sorts. First, there is evidence that appellant spent considerable time talking to these other persons on the phone and meeting them at the club where most of the illegal activity was planned or took place.[4] Second, there are several conversations involving appellant's use of vague, general words such as "the thing," which the agent swears, in context, must be taken as showing direct involvement in the criminal activity.[5] Third, there are conversations which use slang terms commonly used (according to the agents) by loan sharks and gamblers and which suggest direct involvement. For example, appellant spoke to the others about seeing a man who wanted "three dimes" (evidently $3,000).[6] Finally, there are more direct links provided by a source who heard the others involved in loanshark-

ing say that "Joe Timp" was keeping the "book." And, the agent swears he overheard conversations between appellant and others in which they settled up their gambling accounts. On the basis of these and similar allegations, two district court judges found that the first two affidavits provided probable cause for authorization of electronic surveillance, a fact to which we pay deference. *See Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 30 L.Ed.2d 749 (1969); *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979). After reviewing all anew we conclude that, when read in a common sense manner, *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), they provide probable cause for the search.[7]

C. Appellant argues that the search warrant was insufficiently specific. The warrant allowed seizure of

> . . . any and all records relating to extortionate credit transactions (loansharking), including lists of loan customers, loan accounts, telephone numbers, address books, lists of criminal associates, records of income, bank statements, records of deposits, cash and checks which are evidence of violations of 18 U.S.C. Sections

---

4. The affidavits tend to show that the large scale illegal activities were controlled by two groups. The operations, dealings and transactions seemed to be conducted in and from various clubs and bars particularly one located in Cranston, Rhode Island. It was there that the appellant was regularly seen. From April 3 to April 24, 1979, for example, he went to that club seven times when the leaders of one of the groups were also there. He also phoned these same leaders at the club.

5. Thus, for example, on May 1, 1979, appellant called the club and talked to one of the organization's leaders to tell the latter he already had "that thing" for him. In another instance— April 11, 1979—appellant called the club and spoke to the same man about providing money to the owner of a restaurant. Later searches showed that the next day the organization leader actually talked to the owner of a restaurant and asked him to stop by the club to pick up "the thing."

6. On April 13, 1979, an individual whom the FBI believed to be an ex-convict, called the club and spoke to the leaders. They told him to

drop by the next day. One of the leaders informed the appellant on April 14, 1979 that a former prison companion who was in the "travel business" had just stopped by looking for "three dimes." The leader instructed appellant to come over to his place and he would tell him more. Moreover, on April 7, 1979, one of the leaders had called the appellant to discuss something about a debt involving a "dime."

7. Appellant argues that the second electronic surveillance affidavit—the April affidavit—was defective because it did not set out why less intrusive investigative techniques were inadequate, as required by 18 U.S.C. § 2518(3)(c). Appellant does not challenge the original March affidavit, however. And our reading of the April affidavit is that it states by implication that those factors which justified surveillance in this respect in March continued to apply. In April, the government wanted *an extension* of the previous order. Indeed, it was the same investigation that was to be continued.

892, 893, 894, and 371, gambling paraphernalia and gambling records including lists of bettors, telephone numbers, line sheets, address books, bet slips, tally sheets, bottom sheets, accounts, bank statements, deposits, cash and checks which are evidence of violations of 18 U.S.C. Sections 1084, 1952, 1955 and 371.

Appellant correctly states that warrants must "particularly describe the things to be seized" and that "general searches" violate the Fourth Amendment. *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 206, 72 L.Ed. 231 (1927). When properly read, however, *cf. United States v. Ventresca, supra*, we believe that this warrant meets the standards of particularity set by this circuit. *United States v. Bithoney*, 631 F.2d 1 (1980). The warrant breaks the items into categories. Each item is plausibly related to the crime—loansharking or gambling— that is specifically set out. The items, for the most part, are the very instrumentalities of those crimes. The items are not likely to be mixed up with a far larger set of similar, but innocent, items as if, for example, they were in an accountant's office. The warrants provide a standard for segregating the "innocent" from the "culpable" in the form of requiring a connection with a specific, identifiable crime. The affidavits suggest the executing officers will be able to use that standard. *Cf. Andresen v. Maryland*, 427 U.S. 463, 479–82, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976); *United States v. Brien*, 617 F.2d 299, 309 n.11 (1st Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980); *United States v. Abrams*, 615 F.2d 541, 546–47 (1st Cir. 1980). And, most important, it is difficult to see how the search warrant could have been made significantly more precise. The Eighth Circuit in *Spinelli v. United States*, 382 F.2d 871, 886 (1967), *rev'd on other grounds*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), upholding a warrant for "bookmaking paraphernalia," stated,

When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of the items he is seeking.

Thus, we believe this warrant is quite different from those we have found inadequate. *See United States v. Klein*, 565 F.2d 183 (1st Cir. 1977) (warrant provided for seizure of unlawful pirate tapes, where those tapes likely to be mixed together with lawful tapes, no indication of how they would be distinguished prior to seizure, and no support for belief that "a large collection of similar contraband is present on the premises."); *Montilla Records of Puerto Rico v. Morales*, 575 F.2d 324 (1st Cir. 1978) (similar intermixture of pirate records and lawful records); *Application of Lafayette Academy*, 610 F.2d 1 (1st Cir. 1979) (warrant allows seizure of nearly every book and document on premises of school, likelihood of intermixture of a few "unlawful" with many "lawful" documents, and the effort to supply a standard by reference to criminal statutes inadequate in light of broad nature of crimes referred to by, *e. g.*, "conspiracy"); or *United States v. Abrams, supra*, (warrant allowed seizure of virtually all documents in doctor's office, though only a portion of them likely to be relevant to charge of medicare fraud). We find this case similar to those in which we have upheld warrants against charges of insufficient particularity. *See United States v. Brien, supra*, (warrant authorized seizure of virtually all records of a commodities broker whose entire business was allegedly fraudulent); *United States v. Cortellesso*, 601 F.2d 28 (1st Cir.), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980) (warrant authorized search of clothing store for stolen clothes, other stolen goods and related records, where there was likely to be a large collection of contraband in the store and "for all practical purposes the collection could not be precisely described."). We therefore reject appellant's argument.[8]

8. Appellant also claims that in execution of the warrant the search was "excessive" as to the seizure of the weapons. However, the argument of the appellant basically rests upon the erroneous premise that the incriminating nature of the items was not immediately appar-

**6**

■ D. Appellant points out that 18 U.S.C.App. § 1202(a)(1), requires for conviction that the government show that a defendant (1) possessed firearms and (2) had a previous felony conviction. He notes that Count I of his indictment unnecessarily states that he had *two* previous felony convictions. He claims that, since the government need only have proved one prior conviction to win its case, the recitation of two convictions unfairly prejudiced him in the eyes of the jury.

The courts of appeals have adopted differing positions on this issue. On the one hand, the Eighth Circuit has consistently ruled that the government may seek to prove more than one prior felony conviction even if the defendant offers to stipulate that he is a convicted felon. *United States v. Bruton*, 647 F.2d 818, 824–25 (8th Cir. 1981); *United States v. Smith*, 520 F.2d 544, 548–49 (8th Cir.), *cert. denied*, 429 U.S. 925, 97 S.Ct. 328, 50 L.Ed.2d 294 (1976). The Sixth Circuit has adopted a similar position—*United States v. Blackburn*, 592 F.2d 300, 301 (6th Cir. 1979); *United States v. Burkhart*, 545 F.2d 14, 15 (6th Cir. 1976).[9]

On the other hand, the Seventh Circuit has held that the government may not seek to establish more than one prior conviction. (The court did not make clear whether the defendant had offered a stipulation.) *United States v. Romero*, 603 F.2d 640, 641–42 (7th Cir. 1979). The Fifth Circuit also has indicated that the government may not seek to establish more than one conviction—provided the defendant enters into an

appropriate stipulation. *United States v. Barfield*, 527 F.2d 858, 860–62 (5th Cir. 1976); *cf. United States v. LaChappelle*, 542 F.2d 257, 258 (5th Cir. 1976). And the Fourth Circuit has held that the trial court must strike from an indictment reference to the nature of the previous felony conviction once a defendant stipulates that he has been convicted of the prior crime. *United States v. Poore*, 594 F.2d 39, 41–43 (4th Cir. 1979).

We need not here resolve the points of difference suggested by those cases, however, for the defendant has refused to stipulate that he was convicted of a prior felony. Although the presence of a stipulation would have gone far towards showing that the recitation of two prior convictions was unnecessary, unfair, and prejudicial, the absence of the stipulations makes the recitations reasonable. *See* Note, *Prior Convictions and the Gun Control Act of 1968*, 76 Colum.L.Rev. 326, 343 *et seq.* (1976).

For these reasons, the appellant's conviction is

*Affirmed.*

---

ent. *Cf. Coolidge v. New Hampshire*, 403 U.S. 443, 464–78, 91 S.Ct. 2022, 2037–44, 29 L.Ed.2d 564 (1971). On the contrary, we have held in *United States v. Melvin, supra*, addressing this same issue, that "the very nature of the [object]—a sawed-off shotgun . . .—provided probable cause to believe the firearms were contraband." Also, as in *Melvin*, the place where the guns were found as well as the way they were kept constitute incriminating circumstances. *Id.* at 501.

Appellant also claims that the agents should not have removed the guns from the bedroom closet to their car before a search warrant pertaining to those guns arrived. We disagree. The search was continuing. The weapons were loaded. The crimes were serious. The security

of the agents was at stake. Strangers were working in the house and might have entered the room. In a word, it might well have been dangerous to leave the weapons in the bedroom; and removing them to the car while the search went on, in our view, was reasonable. *United States v. Malachesen*, 597 F.2d 1232, 1234–35 (9th Cir.), *cert. denied*, 444 U.S. 902, 100 S.Ct. 214, 62 L.Ed.2d 139 (1979); *United States v. Chapman*, 549 F.2d 1075, 1078–89 (6th Cir. 1977).

**9.** *See* the Third Circuit's opinion in *United States v. Williams*, 612 F.2d 735, 740 (3d Cir.), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1328, 63 L.Ed.2d 770 (1980) with respect to 18 U.S.C. § 922(h)(1).