Riesgo v. Heidelberg Harris, Inc.     CV-96-123-JD   05/30/97 P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Angel R. Riesgo

        v.                              Civil No. 96-123-JD

Heidelberg Harris, Inc., et al.


                            O R D E R


     The plaintiff, Angel Riesgo, filed this employment

discrimination action against the defendants, Heidelberg Harris,

Inc., Bruce Gerry, and National Employment Service Corporation,

seeking damages under federal and state law.  Before the court

are the motion for summary judgment of National Employment

Service Corporation (document no. 26) and the partial motion for

summary judgment of Heidelberg Harris (document no. 39).



                          Background[1]

     National Employment Service Corporation ("National") is an

employment agency that recruits, screens, and refers temporary

employees to client companies.  National pays its temporary

employees by issuing checks based on the number of hours worked

by the employees, as reported by client companies.  National pays

all federal and related payroll taxes on behalf of its temporary

---

   [1]The facts relevant to the instant motion are either not in
dispute or have been alleged by the plaintiff.

employees, including the employer portion of the employees' Social Security taxes; maintains worker's compensation and liability insurance for its temporary employees; offers health insurance to temporary employees, provides holiday pay; and permits employees to accumulate credits toward paid vacation. However, National does not train, equip, supervise, schedule, discipline, or terminate temporary employees.

In approximately February 1993, National recruited, screened, and referred the plaintiff to Heidelberg Harris ("Heidelberg") for temporary assignment in its paint department. Prior to beginning his assignment with Heidelberg, but after being approved for work by Heidelberg, the plaintiff executed a National "Employee Hourly Contract and Obligations" agreement, which obligated the plaintiff not to accept employment with a client company for ninety days following the termination of a National assignment without National's written consent; not to divulge his salary to any client company employee, manager, or contract employee; to submit a time card to National at the end of each workweek; to notify National of an absence; to report any accident to National; to provide five days' notice of an intent to terminate; to notify National when an assignment has ended; and to notify National in the event of an address change. The plaintiff also executed a National "Right to Know" certification,

indicating that he had been informed of his rights with respect to the presence of chemicals at the workplace, and directing the plaintiff to contact National in the event that, after consulting with his on-site supervisor, he did not feel adequately informed about the risks associated with hazardous chemicals at the workplace.

The plaintiff began working as a temporary painter for Heidelberg on February 12, 1993. Approximately thirty percent of the workers in Heidelberg's painting department were temporary employees hired through National, which was the exclusive source of temporary employment in the department.

Heidelberg's policies concerning equal opportunity, employee relations, and standards of conduct are published in an employee handbook. Although the plaintiff never received a copy of the handbook, he was informed of its contents on January 17, 1994. The handbook provides, inter alia, that Heidelberg's personnel decisions are made without regard to race or national origin, and proclaims Heidelberg's "belie[f] that each employee must receive fair and equitable treatment regardless of race . . . or national origin." In addition, the handbook contains a list of conduct that may result in disciplinary action, including horseplay and threatening or intimidating other employees. The first three paragraphs of the introduction to the handbook provide:

3

This handbook provides an overview of the Heidelberg Harris: history, policies, and benefits. It describes the policies and programs which govern employment, and, to a large extent, define the role you play in the Company's continuing success. However, this handbook is not a contract of employment. The policies and procedures in this handbook do not express or imply contractual terms and conditions of employment or other contractual commitments.

Heidelberg Harris will attempt to inform you whenever it is necessary to change, delete, revise or amend any of the policies and procedures in this handbook. However, policies and procedures may be changed at any time with or without notice. No one at the Company, including its officers, has the authority to alter, revise, amend or revoke any policy orally or to make contractual commitments without the express written consent of the Director of Human Resources.

The Company recognizes that all employment is on an at-will basis. Accordingly, the Company recognizes its right to terminate or discontinue the employment of any employee for any reason, with or without notice. Likewise, the Company recognizes the right of any employee to terminate or discontinue his or her employment with the Company for any reason, with or without notice.

On January 12, 1994, the plaintiff came to National's office and met with a National employee, Karen Feeney, to request another assignment. The plaintiff, who is of Cuban origin, informed Feeney that defendant Gerry, the plaintiff's immediate supervisor at Heidelberg, had engaged in a pattern of discrimination against him on the basis of his race and/or national origin. The plaintiff's complaint indicates that Gerry referred to the plaintiff, inter alia, as "Chico," "pig fucker,"

4

"Cuban porch monkey," "sand nigger," and "scum sucking foreigner," and told him, "A Cuban is nothing but a nigger turned inside out," and "You ain't worth shit as a worker. I only keep you around because you're the department's mascot." The plaintiff's complaint also alleges that his co-workers echoed these slurs and that Gerry, at times accompanied by other co-workers, directed physical abuse at the plaintiff, including ripping out clumps of the plaintiff's chest hair, grabbing and twisting the plaintiff's head, pinching the plaintiff's leg, saturating the plaintiff's paintsuit with paint thinner in the genital area, swinging an iron paint hook into the plaintiff's genitals, hanging plaintiff by the belt on paint hooks while taunting him, and throwing the plaintiff into a trash dumpster. None of the individuals specifically charged in the plaintiff's complaint with harassing behavior were placed at Heidelberg by National or had any relation to National.

After hearing the plaintiff's complaints of harassment, Feeney informed the plaintiff that National would take care of the problem and that he should go back to work the following day. Pursuant to its own policy for handling complaints of discrimination and harassment, National prepared a written statement of the plaintiff's complaint and forwarded the complaint to Heidelberg's employee relations manager, Martha

5

Kaubris, who informed the plaintiff that she would investigate the plaintiff's allegations immediately.

On January 13, 1994, the plaintiff attended work and was brought to the Heidelberg personnel office, where he met with Kaubris and a Heidelberg supervisor, Mark McDonnell. Later that day, the plaintiff met with Kaubris again and complained that the harassment was not being adequately addressed. On January 16, 1994, National's president, Michael Moreau, telephoned the plaintiff at home to check up on the response to the complaint. The plaintiff has stated during deposition testimony that he "could not very well tell [Moreau] how everything turned out" because "in reality [they] were still in the middle of the whole thing." The plaintiff further testified that when Moreau asked him if he wanted to continue working at Heidelberg, the plaintiff informed Moreau that he would "play it by ear." Moreau subsequently called Kaubris and informed her that the plaintiff was thankful and grateful for what Heidelberg had done. On January 17, 1994 members of the paint department attended a group meeting, where they were informed of Heidelberg's sexual harassment, equal opportunity, and employee selection and termination policies, and told that harassment would not be tolerated. Kaubris later testified that she relied on Moreau's statement to her in determining that the plaintiff's complaints

6

had been satisfactorily resolved.

Although the plaintiff continued to suffer abuse while working at Heidelberg, he did not renew his complaints because of fear of retaliation. Specifically, the plaintiff had heard about another temporary employee who was terminated by Heidelberg after filing a complaint with National about his working conditions.

On June 4, 1994, Heidelberg terminated the plaintiff's employment, claiming that the plaintiff had disrupted the workplace. Although it was National's policy not to place temporary employees who had been terminated for cause without evaluating the employee's fitness, Moreau immediately volunteered to place the plaintiff in another position after his termination from Heidelberg.

On February 29, 1996, the plaintiff filed the instant lawsuit, asserting that the defendants discriminated against him on the basis of his race in violation of Title VII and 42 U.S.C. § 1981 (counts I and II) and discriminated against him on the basis of his national origin in violation of Title VII (count III). In addition, the plaintiff alleges that Heidelberg and its agents retaliated against him for having complained about discrimination in violation of Title VII (count IV) and that defendant Gerry and other agents of Heidelberg committed assault and battery against and intentionally inflicted emotional

7

distress on him (counts V and VI).  The plaintiff also alleges
that National and Heidelberg negligently inflicted emotional
distress on the plaintiff by failing to protect him from a
hostile work environment (count VII), that the defendant's
actions constitute a breach of the plaintiff's employment
contract with Heidelberg Harris (count VIII), and that the
plaintiff was maliciously terminated (count IX).  By order dated
June 4, 1996, the court dismissed counts II, III, IV, VIII, and
IX against defendant Gerry, and by order dated September 26,
1996, dismissed the plaintiff's claims in counts V, VI, VII, and
IX against Heidelberg.

Discussion

The role of summary judgment is "to pierce the boilerplate
of the pleadings and assay the party's proof in order to
determine whether trial is actually required."  Snow v.
Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting
Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st
Cir. 1992)).  The court may only grant a motion for summary
judgment where the "pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment

8

as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiffs, "indulging all reasonable inferences in that party's favor." Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).


I. National's Motion for Summary Judgment

A. Plaintiff's Claims Arising Under Title VII & 42 U.S.C. § 1981

National seeks summary judgment on the plaintiff's Title VII discrimination claims on the ground that it is not an "employer" within the meaning of Title VII. It further contends that summary judgment is warranted on the plaintiff's Title VII

9

discrimination claim, as well as the plaintiff's claims arising under 42 U.S.C. § 1981, because it took all steps available to it in responding to the plaintiff's allegations of harassment. The plaintiff contends that National is a joint employer for purposes of Title VII, and claims that National did not respond appropriately to the plaintiff's complaints.

The court notes at the outset that counts I, II, and III of the plaintiff's complaint, without expressly so stating, appear to seek redress under Title VII and § 1981 under a hostile work environment theory. The court arrives at this conclusion based on the nature of the allegations in the plaintiff's complaint and the fact that the complaint expressly alleges retaliatory, as opposed to constructive, discharge.

Title VII's prohibition against discrimination on the basis of race with respect to the terms, conditions, or privileges of employment, see 42 U.S.C.A. § 2000e-2(a)(1) (West 1994),[2] and

---

[2]42 U.S.C. § 2000e-2(a) provides in pertinent part:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

10

§ 1981's guarantee of equal opportunity to make and enforce contracts without regard to race, see 42 U.S.C.A. § 1981(a),(b) (West 1994),[3] secure an employee's right to a racially nonhostile work environment.  A plaintiff alleging a racially hostile work environment may bring a claim against his employer under Title VII or § 1981 if (1) he suffered discriminatory harassment because of race; (2) the harassment was pervasive and regular; (3) the harassment detrimentally affected the plaintiff; (4) the harassment would detrimentally affect a reasonable person of the same race in that position; and (5) respondeat superior liability

---

42 U.S.C.A. § 2000e-2(b) (West 1994), which catalogs the list of unlawful employment agency practices, does not bar discrimination with respect to the "terms, conditions, or privileges of employment."  Because it is this prohibition that provides the basis for a hostile work environment claim under Title VII, see, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), the plaintiff's claims are not cognizable under § 2000e-2(b).  See Kellam v. Snelling Personnel Servs., 866 F. Supp. 812, 817 (D. Del. 1994) (language of § 2000e-2(b) does not reach sexual harassment), aff'd, 65 F.3d 162 (3d Cir. 1995).

[3]42 U.S.C. § 1981 provides in pertinent part:

   (a)  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens.

   (b)  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

11

exists.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996); see also Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1509 (11th Cir. 1989) (plaintiff may succeed under Title VII or § 1981 by demonstrating racially hostile work environment); Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1421 (employer liable under § 1981 and Title VII by failing to prevent barrage of racist acts of which it knew or should have known), cited in Lipsett v. University of P.R., 864 F.2d 881, 901 (1st Cir. 1988); DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980) (employer who takes reasonable steps to correct and/or prevent racial harassment by its nonsupervisory personnel does not violate Title VII); cf. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986) (sexual harassment creating hostile work environment actionable under Title VII).

In the instant case, the parties heatedly dispute the issue of whether National, as the employment agency through which the plaintiff procured work at Heidelberg, can be held liable for the hostile work environment at Heidelberg's workplace.  Much of this dispute concerns the question of whether National was the plaintiff's "employer" within the meaning of Title VII.  Compare Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 611 F. Supp. 344, 349 (S.D.N.Y. 1984) (assuming that employee who brought Title VII complaint against company to which she was

12

assigned by temporary agency was employee of temporary agency), aff'd sub nom. Aharnare v. Merrill Lynch, 770 F.2d 157 (2d Cir. 1985) with Astrowsky v. First Portland Mortgage Corp., 887 F. Supp. 332, 336 (D. Me. 1995) (employment agency not plaintiff's employer where it exercised no control over him as employee) and Kellam v. Snelling Personnel Servs., 866 F. Supp. 812, 815-16 (D. Del. 1994) (excluding temporary employees in determining whether employment agency employed more than fifteen employees and thus fell within purview of Title VII).

The court need not address this question. Even assuming arguendo that National was the plaintiff's employer, the undisputed record indicates that National's response to the plaintiff's allegations was appropriate under the circumstances, and therefore would satisfy any duty created by Title VII or § 1981. As noted above, National promptly reported the plaintiff's allegations to Heidelberg. A few days later, National's president called the plaintiff to ascertain whether any corrective action had been taken, and specifically asked the plaintiff whether he wanted to continue working at Heidelberg. The plaintiff responded that he would "play it by ear" and did not voice any further complaints to National. Although the plaintiff contends that National could have, inter alia, conducted its own investigation in response to the events alleged

13

by the plaintiff, more accurately passed on the plaintiff's reaction to Heidelberg's response, or placed pressure on Heidelberg by threatening to remove its employees, these proposals impose a wholly unrealistic burden on National. The record indicates that National had virtually no control over the plaintiff's activities at work and was not the employer of any of the Heidelberg employees responsible for the harassment. In addition, National's president was not authorized to enter Heidelberg's premises without Heidelberg's permission, and did not have the right to take direct action against Heidelberg's direct employees. Under these circumstances, no reasonable factfinder could determine that National's conduct constituted an inadequate response to the plaintiff's complaints. See DeGrace, 614 F.2d at 805 ("[O]nce an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct, we do not think he can be charged with discriminating on the basis of race."). Accordingly, the court grants summary judgment in favor of National on the federal claims asserted against it (counts I, II, and III).

B. State Law Claims

National is entitled to summary judgment on counts V

14

(assault and battery) and VI (intentional infliction of emotional distress) of the plaintiff's complaint because neither count seeks recovery for the conduct of National or any of its agents. Similarly, National is entitled to summary judgment on count VIII (breach of contract) because National was not a party to the contract allegedly breached. Finally, National is entitled to summary judgment on count VII (negligent infliction of emotional distress based on failure to protect the plaintiff from a hostile work environment) for the reasons discussed in Part I.A., supra.

II.   Heidelberg's Motion for Summary Judgment

      A.   Plaintiff's Claim Under 42 U.S.C. § 1981

      Relying on a rule adopted by the Fifth Circuit in 1982, Heidelberg asks the court to dismiss the § 1981 claims asserted by the plaintiff on the ground that they are duplicative of the plaintiff's Title VII claims. See, e.g., Aldridge v. Tougaloo College, 847 F. Supp. 480, 487 (S.D. Miss. 1994) ("The Fifth Circuit has stated in numerous employment discrimination cases that where the plaintiff has alleged violations of both Title VII and section 1981, the Court as a rule, will consider an alternative remedy brought under section 1981 only if violation of that statute can be made out on grounds different from those available under Title VII.") (citing Rivera v. City of Wichita

15

Falls, 665 F.2d 531, 534 n.4 (Former 5th Cir. 1982)). However, this argument flies in the face of the Civil Rights Amendments of 1991, in which Congress provided a limited framework under which Title VII plaintiffs could recover compensatory and punitive damages. In so doing, Congress expressly provided that the framework it was introducing for Title VII plaintiffs was only applicable if "the complaining party [could not] recover under section 1981 of this title," 42 U.S.C.A. § 1981a(1) (West 1994) and further provided that "nothing in this section shall be construed to limit the scope of, or limit the relief available under [42 U.S.C. § 1981]", id. § 1981a(b)(4). See also Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 461 (1975) ("[T]he remedies available under Title VII and under § 1981, although related and although directed to most of the same ends, are separate, distinct, and independent . . . ."); Bradshaw v. University of Me. Sys., 870 F. Supp. 406, 406 (D. Me. 1994) (noting that a race discrimination plaintiff is entitled to both compensatory and punitive damages under § 1981). Because Title VII's framework for calculating damages does not preempt the plaintiff's § 1981 claim, the court denies Heidelberg's motion for summary judgment on the plaintiff's § 1981 claim.

16

B. <u>Breach of Contract</u>

Heidelberg also argues that it is entitled to summary judgment on the plaintiff's breach of contract claim because it was not contractually bound to the provisions of the employee handbook that the plaintiff claims were breached.

Under New Hampshire law, the unilateral announcement of the terms of employment to an at-will employee may be treated as an offer subject to the employee's acceptance, as expressed by the continued performance of his duties. See <u>Panto v. Moore Bus. Forms, Inc.</u>, 130 N.H. 730, 735, 547 A.2d 260, 264 (1988). However, an employer may disclaim its intent to be contractually bound to the terms of a handbook. See <u>id.</u> at 742, 547 A.2d at 268; <u>see also</u> <u>Butler v. Walker Power, Inc.</u>, 137 N.H. 432, 436, 629 A.2d 91, 93 (1993). Although language indicating that a handbook is not a "contact of employment" is sufficient to disclaim the employer's intent to create a tenured employment relationship, such language "relates to the bare employment contract, stripped of all its incidental benefits and secondary contractual relationships." <u>Id.</u> at 437, 629 A.2d at 93. Thus, to disclaim an intent to be bound by policies included in a handbook that are not related to the fact or duration of employment, an employer must specifically state such an intent. See <u>id.</u> at 437, 629 A.2d at 93.

17

Here, the plaintiff has alleged in both his complaint and his opposition to Heidelberg's motion for summary judgment that Heidelberg is contractually bound to the policies set forth in its employee handbook. However, in addition to stating that it "is not a contract of employment," the handbook clearly states that the "policies and procedures [promulgated therein] do not express or imply contractual terms and conditions of employment or other contractual commitments." Because this language effectively disclaims Heidelberg's intent to be bound to the provisions upon which the plaintiff relies, the plaintiff's breach of contract claim must fail.[4]

## Conclusion

The motion for summary judgment of National Employment Service Corporation (document no. 26) is granted. There are no

---

[4]The plaintiff argues that he is not bound by the terms of the disclaimer because he was not aware of its contents. However, a party cannot claim that certain provisions of a document create a contractual agreement while simultaneously disregarding provisions of the same document that disclaim contractual liability. To the extent the plaintiff claims that Heidelberg is bound by statements made by Heidelberg agents during the January 17, 1994, meeting, these statements -- through which permananent and temporary employees were informed of the company's sexual harassment, equal opportunity, and employee selection and termination policies -- are beyond the scope of the plaintiff's complaint and therefore cannot form the basis of his breach of contract claim.

18

remaining claims against National.  The partial motion for summary judgment of Heidelberg Harris (document no. 39) is granted in part and denied in part.

The clerk will schedule a status conference.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

May 30, 1997

cc:  Alfred T. Catalfo, Esquire
     H. Jonathan Meyer, Esquire
     Mark T. Broth, Esquire
     Martha V. Gordon, Esquire
     Lawrence B. Gormley, Esquire

19