**UNITED STATES of America,
Plaintiff,**

v.

**Hernan Figueroa RODRIGUEZ,
Defendant.**

**No. CRIM. 98–262(SEC).**

United States District Court,
D. Puerto Rico.

Sept. 30, 1999.

Guillermo Gil, U.S. Attorney, Mark Irish, Jorge E. Vega–Pacheco, U.S. Attorney's Office District of P.R., San Juan, PR, for Plaintiff.

Antonio Bauza–Torres, Luz M. Rios–Rosario, San Juan, PR, for Defendant.

## OPINION AND ORDER

CASELLAS, District Judge.

On November 18, 1998, agents from the Bureau of Alcohol, Tobacco and Firearms (hereinafter "ATF") executed a search warrant at defendant's home. While the warrant was issued particularly for the search of the residence, upon defendant's consent, ATF agents also searched a 1996 Chrysler Intrepid (hereinafter the "Intrepid") belonging to him, which was parked on the street in front of his home. From the search of the Intrepid, ATF agents obtained three firearms. Defendant was subsequently indicted for possession of firearms in or affecting interstate commerce, in violation of 18 U.S.C. § 922(g) and 924(a)(2) (**Docket # 8**). On March 19, 1999, defendant moved to suppress the firearms, as well as various other items and statements obtained from him (**Docket 24**). The government duly opposed (**Docket # 25**) and defendant replied (**Docket # 28**). A suppression hearing was held on June 29, 1999 (**Docket # 30**). The only issue for the Court is whether defendant's consent to search the Intrepid was valid. We find that it was not, and for the reasons set forth below, we now **GRANT** defendant's motion to suppress (**Dockets # 24 and # 28**).

### Background

On November 16, 1998, on the basis of an affidavit by ATF Special Agent Hiram Andrades, a United States Magistrate Judge issued a warrant authorizing the search of defendant's residence for, among other things, firearms, narcotics, and ammunition.[1] In the affidavit, Agent Andrades stated:

---

1. More particularly, Attachment B of the warrant described the items to be seized as:

1. All firearms, including but not limited ·to, 16 firearms (3 AK–47, 2 AR–15, 4

1. that both defendant and his common-law wife had been previously convicted for state narcotics and firearms statutes violations;

2. that about twelve days before the execution of the search warrant, a reliable confidential informant had observed approximately sixteen firearms, which were being kept in a yellow duffel bag at defendant's residence;

3. that about four days prior to the execution of the warrant, the informant had again seen these weapons at defendant's residence;

4. that about fourteen days prior to the execution of the warrant, the confidential informant had seen defendant at his residence display a firearm on his waistband;

5. that on that same occasion, the informant had also seen about five kilograms of cocaine at defendant's residence, and that defendant's residence was also used to store narcotics;

6. that a computer check of a 1996 Hyundai Accent parked at defendant's residence turned out to be registered to defendant's common-law wife; and

7. that neither defendant nor his common-law wife had a license to possess firearms.

In the affidavit, Agent Andrades did not mention the Intrepid. However, at the suppression hearing he testified that prior to applying for the warrant, a computer check of the Intrepid, which had been spotted parked on the street in front of defendant's residence, revealed that it was registered in defendant's name.

On November 18, 1998, at approximately 6:30 a.m., about ten to fifteen uniformed ATF agents showed up displaying their weapons at defendant's home to execute the warrant. They knocked and announced their presence yelling for somebody to open the door, but after a short while without receiving an answer, they forced their entry with a nail and a ram into the house. As they were making their way in with their guns drawn, the agents encountered defendant near the kitchen area. Special Agent Andrades immediately pinned defendant to the floor and handcuffed him, while the other agents conducted a protective sweep. Defendant did not resist and he was kept handcuffed in a chair in the kitchen area, and without having been informed of his *Miranda* rights, during the entire search—which lasted approximately three hours—, until he was formally placed under arrest. While securing the area, the agents also encountered defendant's common-law wife and their infant daughter (she was about three years old) in one of the rooms in the back of the house. Defendant's common-law wife was brought to the front of the house, while a female agent remained with the crying child in the latter's bedroom.[2] Once the premises and its occupants were secured, the agents initiated the search.

After searching the house and two cars which were in the garage, and for which no warrant or consent had been obtained, the agents did not find any of the items to be seized, or any other illegal or incriminating

---

MAC–10/11, and approximately 7 handguns).
2. Contraband, specifically narcotics and narcotics paraphernalia.
3. Documents and records reflecting the sale and purchase of firearms.
4. Documents and records reflecting the shipping, receiving and/or transporting of firearms from their point of origin.
5. Any containers and/or items used to conceal the shipment of firearms or contraband.
6. Ammunition.
7. Indicia and proof of residency.

8. All of which consists the fruits, instrumentalities and evidence of violation of the Federal Firearms Statutes, including Title 18, United States Code, Section 922(g)(1), and/or 924(c).

**2.** At the hearing, defendant's counsel unsuccessfully attempted to elicit that the female agent threatened defendant's common-law wife with arresting her and having her daughter taken away if she did not reveal where the evidence was.

evidence. Simply put: they struck out. The only items of any interest to the government which the agents were able to obtain were a digital scale, some photographs and the registration and bill of sale of the Intrepid. Regarding the scale, the prosecution was unable link it at the suppression hearing to any type of criminal activity, and Agent Andrades was unable to say whether it could be purchased commercially in any store. The photographs, moreover, were not admitted into evidence for present purposes because of their little probative value.[3]

At some point—most likely at the end of the search, according to the chronology of events that emerged at the hearing—Agent Andrades began questioning defendant about the Intrepid, even though he had no basis to suspect that it harbored any contraband. Despite knowing that the vehicle belonged to defendant, Agent Andrades asked defendant about the vehicle's ownership. Defendant responded that he did not know whom did it belong to; that it was not his. Agent Andrades then confronted him with the bill of sale of the vehicle, but the latter remained silent. At that time, Agent Andrades decided to search the Intrepid. Since no warrant had been issued for that purpose, he showed defendant a written consent to search form printed in English for him to sign. However, as defendant is Spanish-speaking, the form needed to be translated. Although he had never before used Spanish to obtain a person's consent to search, and although there were other Spanish-speaking agents present who may have better done so, Agent Andrades attempted to translate the consent to search form into Spanish himself. Basically, Agent Andrades made a literal translation of the form as he read it to defendant.

According to Agent Andrades, defendant indicated that he did not object to the search of the Intrepid and agreed to sign the consent to search form. Agent Andrades filled it out and handed it to defendant. As he was about to sign it, defendant asked Agent Andrades "whether they [ATF agents] were going to search the vehicle anyway," to which the latter responded affirmatively. As Agent Andrades testified at the hearing, "[a]t this time I said yes, I simply said yes." Defendant then signed the form printed in English, and Agent Andrades proceeded along with a fellow agent to conduct the search which resulted in the discovery of the firearms which defendant now seeks to suppress.

At the suppression hearing, defendant presented the testimony of Ismara Torres Cruz, his next-door neighbor. Torres Cruz testified that the Intrepid was searched twice: the first time, for about fifteen to twenty minutes; the second time—probably fifteen minutes later—for about two or three minutes. During the second search, Torres Cruz saw the agents pull out something metallic from the car and place it in a plastic bag. At the hearing, defendant's counsel contended that it was during the first search, which he alleged was conducted without defendant's consent, that the agents actually discovered the firearms; and that they staged the second search after obtaining his consent, only to cover up the illegality of the first. Agent Andrades acknowledged going twice into the Intrepid. According to him, however, he did so following normal ATF procedure. Agent Andrades explained that after obtaining defendant's consent, he began searching the vehicle, and that as he lifted the corner of the center console, he spotted a firearm. At that time, he stopped searching and went back into the house to get the photographer to document the evidence found, and some tools to retrieve it. Both Torres Cruz and Agent Andrades were direct and straightforward in their

---

**3.** They were admitted only for the purpose of showing that they were found at defendant's residence.

testimonies, making either version of the facts plausible. Fortunately, however, we need not make a choice between the two, there existing other factors in which we may rely to reach our decision.

Defendant additionally attacks the validity of his consent on two other fronts: (1) under the voluntariness-under-the-totality-of-the-circumstances standard set out in *Schneckloth v. Bustamonte,* 412 U.S. 218, 250, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and its progeny, arguing that his consent was coerced; and (2) under the "fruit-of-the-poisonous-tree" doctrine, *see Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), arguing that his consent was the result of his pre-arrest detention, which he also challenges as unlawful.

**Applicable Law/Analysis**

**Lawfulness of Defendant's Detention During the Execution of the Search Warrant**

The Supreme Court in *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) held that "for Fourth Amendment purposes, ... a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. 2587 (footnotes omitted). In assessing the justifications for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, the Court noted that both the "law enforcement interest and the nature of the 'articulable facts' supporting the detention are relevant." *Id.* at 702, 101 S.Ct. 2587. The Court identified the following three law enforcement interests as furthering such detentions: (1) "preventing flight in the event that incriminating evidence is found," (2) "minimizing the risk of harm to the officers," and (3) facilitating the orderly completion of the search. *Id.* at 702–03, 101 S.Ct. 2587. As to the articulable facts supporting the detention, the Court explained that the exis-

tence of a warrant to search for contraband issued by a neutral judicial officer provides the requisite probable cause to believe that someone in the home is committing a crime, and, therefore, "the connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 703–04, 101 S.Ct. 2587.

The rule adopted by the Court in *Summers* is rather categorical and does not require law enforcement officers to make an ad hoc, case-by-case evaluation of the circumstances surrounding the execution of the warrant when purporting to detain an occupant of the premises to be searched. *Id.* at 705 n. 19, 101 S.Ct. 2587. Thus, law enforcement officers "may *always* detain persons found at the premises named in a search warrant, provided (i) the warrant authorizes a 'search for contraband' and (ii) the persons detained are 'occupants.'" 2 Wayne R. LaFave, *Search and Seizure* § 4.9(e), at 650 (3d ed.1996).

Notwithstanding its validation of the limited authority to detain an occupant of premises while a proper search for contraband is being conducted pursuant to a warrant founded on probable cause, the Court acknowledged that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case." *Id.* at 705 n. 21, 101 S.Ct. 2587. No such circumstances, however, were present in that case. The defendant in *Summers* was detained as he was descending the front steps of his home for which the police had a warrant to search for narcotics. The police requested his assistance in gaining entry to the house and detained him while they searched the premises. The police found the narcotics and after ascertaining that the house belonged to defendant, they arrested and searched him, recovering more narcotics from his coat. In determining whether defendant's initial detention violated his Fourth Amendment right against an un-

reasonable seizure of his person, the Court stressed that his detention while the search of the house was being conducted was less intrusive than the search itself, and that "most citizens—unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions." *Id.* at 701, 101 S.Ct. 2587. The Court also noted that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." *Id.* Finally, the Court stated that "because the detention in this case was in … [defendant's] own residence, it could only add minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702, 101 S.Ct. 2587.

█ There should be no doubt that in the present case ATF agents had the authority, and it was prudent, to detain defendant while the search was being conducted. They had a warrant issued by a United States Magistrate Judge authorizing the search of his residence for contraband, to wit: illegal weapons and narcotics; and they had ascertained that defendant occupied the residence. In addition, ATF agents also had good reason to believe that defendant might be armed, based on his prior narcotics[4] and weapons laws convictions, as well as on the information provided by the confidential informant.

█ However, defendant's detention in handcuffs during the close to three hours that the search lasted was unreasonably prolonged, especially after the agents had secured the premises and ascertained that defendant was not armed. *Cf. United States v. Timpani,* 665 F.2d 1, 2–3 (1st Cir.1981) (making defendant remain with

agents and refusing to allow him to telephone his lawyer during the first forty-five minutes of a five-hour search for contraband at his house, in order to minimize the risk of sudden violence or frantic efforts to conceal or destroy evidence, was permissible under *Summers* ); *Renalde v. City and County of Denver,* 807 F.Supp. 668, 672 (D.Colo.1992) (handcuffing defendant and making him lie face-down on the floor for a prolonged period of time, even after initial sweep of his residence pursuant to a search warrant had revealed no weapons, held unreasonable and outside the scope of *Summers* ). The initial protective sweep of defendant's residence did not reveal the presence of either weapons or narcotics. Defendant was also found not to be carrying any weapons or controlled substances. Moreover, there were about ten to fifteen agents in the house—not to mention Agent Andrades's continued and close surveillance of defendant—to (1) ensure that defendant did not attempt to flee in the event that incriminating evidence was found; (2) minimize the risk of defendant harming the agents or the other occupants present; and (3) facilitate the orderly completion of the search. All of these circumstances made it unnecessary and, more importantly, unreasonable, to keep defendant handcuffed during the entire and prolonged search after they had made sure that the situation was safe.

█ But that defendant's pre-arrest detention constituted an unlawful seizure of his person does not automatically lead to the conclusion that his consent was tainted with that primary illegality. *See, e.g., United States v. McCoy,* 977 F.2d 706, 710 n. 4 (1st Cir.1992); *United States v. Budzyna,* 666 F.2d 666, 671 (1st Cir.1981); *United States v. Pimental,* 645 F.2d 85, 86 (1st Cir.1981); 3 LaFave, *supra,* § 8.2(d), at 658–60. While the First Circuit has not squarely addressed the issue, the Tenth

4. The Court in *Summers* noted that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to

sudden violence or frantic efforts to conceal or destroy evidence." 452 U.S. at 702.

Circuit has determined that "[w]hen a consensual search is preceded by a Fourth Amendment violation, as in this case, the government must prove not only the voluntariness of the consent under the totality of the circumstances ..., but the government must also 'establish a break in the causal connection between the illegality and the evidence thereby obtained.'" *United States v. Melendez–Garcia,* 28 F.3d 1046, 1053 (10th Cir.1994) (citations omitted).[5]

## Defendant's Consent

■■■■ "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which include consensual searches. *See id.* at 358, 88 S.Ct. 507. In order to justify a search on the basis of consent, the prosecution must demonstrate by a preponderance of the evidence, *see United States v. Schaefer,* 87 F.3d 562, 569 (1st Cir.1996), that the consent was voluntary, and "not the result of duress or coercion, express or implied." *Schneckloth,* 412 U.S. at 250, 93 S.Ct. 2041. *See also Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). The voluntariness of the consent must be assessed under a totality-of-the-circumstances approach. *See Schneckloth,* 412 U.S. at 250, 93 S.Ct. 2041; *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In making this determination, the court should consider some "individualized" factors, such as "age, education, experience, intelligence, and knowledge of the right to withhold consent," as well as "[m]ore general considerations," like "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *United States v. Barnett,* 989 F.2d 546, 555 (1st Cir.1993). Consent will be found voluntary if after considering all the circumstances then obtaining, it may be established that it was "the product of an essentially free and unconstrained choice by its maker." *Schneckloth,* 412 U.S. at 224, 93 S.Ct. 2041. Therefore, when consent is obtained by overbearing a defendant's will and critically impairing his capacity for self-determination, it will inevitably be found invalid. *See id.* at 224, 93 S.Ct. 2041.

■■■■ The Court in *Schneckloth* limited the applicability of the voluntariness under the totality of the circumstances standard to non-custodial settings, *see id.* at 240 n. 29, 249, 93 S.Ct. 2041, although it subsequently noted in *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) that "the fact of custody alone has never been enough in itself to demonstrate a coerced ... consent to search." *Id.* at 424, 96 S.Ct. 820. *See also United States v. Forbes,* 181 F.3d 1, 6 (1st Cir.1999) (custody not sufficient in itself to demonstrate that consent was coerced); *United States v. Navedo–Colon,* 996 F.2d 1337, 1338 (1st Cir.1993) (same); *Barnett,* 989 F.2d at 555 (same). Unlike in *Watson,* in the present case, defendant was unlawfully under custody. We think, nonetheless, that, for purposes of assessing the voluntariness of consent under *Schneckloth,* the consideration of custody as insufficient in itself to demonstrate coercion should not be at variance, in this case, with whether the defendant was lawfully or unlawfully under custody, and that the illegality of a

---

5.  As one commentator has explained:

    While there is a sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality.

    3  LaFave, *supra,* § 8.2(d), at 655–56 (footnotes omitted).

defendant's custody should only be accounted for as an additional factor in the court's totality-of-circumstances assessment.[6]

▮ At the time of the events in question, defendant was about twenty-five years old, and he had two prior felony convictions for Commonwealth controlled substances and weapons statutes violations. There is no evidence in the record pertaining to his education, experience or intelligence. Furthermore, there is no indication that he was—or is—mentally deficient.[7] Whether defendant knew of his right to refuse consent, however, is strongly contested. On the one hand, defendant argues that "he was not told or warned he was free to decline consent to the search" (**Docket # 24, at ¶ 6**). On the other hand, the government challenges that the consent to search form signed by defendant duly advised him of his right to refuse consent (**Docket # 25, at 10**). This argument is unavailing, since a critical issue during the suppression hearing was precisely Agent Andrades's proficiency to aptly translate the consent form into Spanish. Moreover, while the government is right in that a failure to inform a defendant about the right to refuse consent is not "the *sine qua non* of an effective consent," such knowledge "is one factor to be taken into account." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. *See also Robinette*, 519 U.S. at 39, 117 S.Ct. 417.

At the suppression hearing, Agent Andrades essayed to translate the consent to search form as he did so the day of the events in question. Assuming that the former translation replicated the latter, we find that defendant was ill-advised of his constitutional rights. *See Barnett*, 989

F.2d at 555 (whether the consenting party was advised of his or her constitutional rights is one factor to be taken into account). The translation was literal and clumsy, almost awkward-sounding. While under more relaxed circumstances it would not be implausible to find that Agent Andrades's translation sufficiently informed defendant about some basic concepts (e.g., his right to refuse consent, his right to consult an attorney), the implicitly coercive environment created by ATF agents at defendant's home precludes such a finding.[8]

Indeed, when his purported consent to search the Intrepid was obtained, defendant was handcuffed, unlawfully seized, and separated from his family. His three year old daughter was crying and left alone with an ATF agent. Also, there were from ten to fifteen ATF agents with their weapons drawn searching his house. Moreover, Agent Andrades told defendant, or at least strongly implied, that the Intrepid would be searched regardless of his consent. Under these circumstances, we cannot find that defendant's consent to search the Intrepid was "the product of an essentially free an unconstrained choice," *Schneckloth*, 412 U.S. at 224, 93 S.Ct. 2041, and that it was, therefore, voluntary.

▮ Having thus found, it is unnecessary to assess whether his consent to search the Intrepid was obtained by "exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407). However, even assuming *arguendo* that defendant's consent was valid, it cannot be established

---

**6.** *See* 3 LaFave, *supra*, § 8.2(d), at 658 ("that the arrest was made without probable cause is in one sense unrelated to the voluntariness issue, for in terms of the coercion flowing from the fact of custody an illegal arrest does not bring about any duress 'beyond that inherent in any arrest.' ").

**7.** *See Watson*, 423 U.S. at 425, 96 S.Ct. 820 (considering whether defendant was mentally deficient in assessing the voluntariness of his consent).

**8.** At the hearing, the prosecutor unsuccessfully attempted to elicit that defendant consented to the search even before the consent form was translated to him.

that it was purged of the taint of the seizure of his person in violation of his Fourth Amendment right. While there is no evidence that defendant was illegally arrested specifically for the purpose of obtaining his consent to search the Intrepid, or that the agents' conduct was flagrant, no appreciable period of time elapsed between defendant's arrest and his purported consent, and no intervening circumstances were present. *See id.* at 603–04, 95 S.Ct. 2254 (footnotes and citations omitted) (in assessing the effect of a prior illegality upon a subsequent consent, account must be taken of "[t]he temporal proximity of the arrest and the ... [consent], the presence of intervening circumstances, and, particularly the purpose and flagrancy of the official misconduct ....")

For the foregoing reasons, all the evidence obtained from the search of defendant's Intrepid should be, and is hereby, suppressed. Moreover, any statements elicited from defendant while unlawfully arrested should be, and are also hereby, suppressed pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and its progeny. Accordingly, defendant's motion to suppress (**Docket # 24**) is hereby **GRANTED.**

   **SO ORDERED.**